[No. B042713. Second Dist., Div. Three. Feb. 22, 1990.]

WOODLAND HILLS HOMEOWNERS ORGANIZATION, Plaintiff and Appellant, v.
LOS ANGELES COMMUNITY COLLEGE DISTRICT, Defendant and Respondent;
SHIR CHADASH—THE NEW REFORM CONGREGATION, Real Party in Interest and Appellant.

low

80

**COUNSEL**

Antonio Cosby-Rossman for Plaintiff and Appellant.

Warren S. Kinsler for Defendant and Respondent.

Loeb & Loeb, Peter N. Scolney and Daron L. Tooch for Real Party in Interest and Appellant.

**OPINION**

**ARABIAN, J.—**

### INTRODUCTION

This appeal challenges the validity of a 75-year lease of surplus community college real property to a religious organization.

Plaintiff and appellant Woodland Hills Homeowners Organization (WHHO) seeks to invalidate a lease between the defendant and respondent Los Angeles Community College District (District) and real party in interest Shir Chadash—The New Reform Congregation (Congregation) for noncompliance with section 82530 of the Education Code and violation of the establishment clauses of the United States and California Constitutions. The Congregation wishes to develop the real property for religious, educational and private use.

We find that Education Code section 82530 does not apply to the long-term lease of surplus community college property and that the lease in question is consistent with the dictates of the state and federal Constitutions. We therefore affirm the judgment in favor of the District, entered following grant of the District's motion and denial of WHHO's motion for summary judgment.

We also affirm the trial court's denial of an award of attorneys' fees to the Congregation, appealed by the Congregation in the related cross-appeal.

FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 1988, WHHO[1] filed a complaint for declaratory and injunctive relief against waste of public funds and property. The complaint alleged that the District leased a 17.5-acre parcel (the parcel) to the Congregation on November 6, 1986, for a term of 75 years at a rental of $3,025,000, without prior public disclosure of the terms. WHHO alleged that the consideration was "grossly inadequate" and that the lease was actually a lease with option to purchase, in that the planned development of a temple, meeting rooms, and residential housing as contemplated in the lease would force the District to relinquish its fee interest. Such a "gift," WHHO alleged, would involve the District in the unconstitutional establishment of a religious enterprise. The complaint also alleged a violation of Education Code section 81363.5, requiring the District to first offer the parcel for public recreational use, other academic use or other public use.

The District and Congregation each answered, denying the material allegations and asserting a number of affirmative defenses. Thereafter, the Congregation, joined by the District, and the Association each moved for summary judgment. The trial court reviewed the lease, the "confidential" report prepared by the District staff regarding the Congregation's interest and proposals for lease of the parcel, and documentation of the District's action.

---

[1] The complaint alleged that WHHO's membership included at least 575 households, at least half of whom resided north of Ventura Boulevard in the neighborhood of Pierce College, and included 50 households immediately surrounding the 17.5-acre parcel owned by the District.

In support of its motion, the Congregation submitted the declaration of David Czamanske, the District's contracts coordinator. Czamanske declared that as a result of financial pressures, the District sought to generate additional revenue by sale or lease of its surplus real property, including four parcels adjacent to Pierce College, one of nine colleges comprising the District. On August 17, 1983, the board of trustees of the District (the Board) authorized its staff to notify various public and nonprofit entities of its intent to offer the parcels to these public entities "for park or recreational purposes or for open-space purposes . . . ." Such an offering is required by Education Code section 81363.5 as a prerequisite to the sale or lease with an option to purchase of property. The District's notice of surplus land sale dated October 22, 1983, listed the minimum price for the parcel at issue here as $3.3 million and stated that all bids must be submitted by January 17, 1984. No offers were received and the property was not sold.

Since 1983 the parcel has been zoned RA-1, which permits only limited agricultural uses, including residences with a minimum area of 17,500 square feet per unit. The $3.3 million price on the section 81363.5 offering was based on a June 17, 1983, appraisal which assumed that the property could be rezoned for single-family residential development.[2] Between 1983 and 1986 the District staff met with several parties interested in the acquisition of the four surplus parcels. It is a common practice for public agencies to meet prior to a public bid offering with potential developers interested in leasing or purchasing real property to determine their interest and willingness to bid.

On May 28, 1986, pursuant to Education Code sections 81360 and 81365, the Board voted to adopt a resolution of intention to offer the subject parcel for lease. The resolution was based upon a finding that the parcel was "not needed for educational purposes in the foreseeable future," and therefore was "being offered on a long-term ground lease basis to generate operational income for the District." The resolution specified the general uses which could be made of the property, including "institutional, community or residential purposes for a period not to exceed 75 years with a minimum rent of $3 million to be received by the District within an initial four-year period to include $600,000 upon execution of the lease and an equal amount each year thereafter; or for $300,000 per year over the term of the lease." The parcel was offered on a "non-contingency basis," with the risk of acquiring any needed zone changes or governmental approvals on the lessee. The notice was posted at City Hall, the Los Angeles County Hall of

---

[2] Czamanske declared that the District explored the potential for rezoning the parcel for commercial or medium to high density residential purposes, but that the local council member disfavored rezoning for more intense uses.

Administration, the Los Angeles County Courthouse, 111 North Hill Street, Los Angeles, and published in the Los Angeles Daily Journal on June 9, 16, and 23, 1986.

The District also mailed notices to about 275 persons on the District's real property mailing list. The Board's intention to lease the property received widespread publicity including a front page article in the Daily News and a Los Angeles Times article. A WHHO newsletter dated June 1986 contained a news item, which stated, "DEVELOPMENT FEVER HITS EVERYWHERE —No acreage is safe from development these days. The L.A. Community College District will seek bids from developers to lease 17.6 acres East of Pierce College which have been used to grow feed for livestock in the college's farm program. . . ."

Between June 10 and July 18, 1986, the District received requests for complete bid packages from 41 interested bidders. On July 18, 1986, the District mailed the requested bid packages.

On August 21, 1986, the District held a written bid opening and an opportunity for oral bidding. The only bid the District received was the written bid of the Congregation. This bid was reviewed and approved by the Board on October 1, 1986. At the same time, the Board established a special sinking fund for investment purposes during the term of the lease, with annual earnings available for the operational needs of the District. The District's anticipated return on the investment was $22.1 million, along with the return of the property at the end of the lease term. If the principal and interest were reinvested, the expected return was $3.2 billion.

On November 6, 1986, the District and the Congregation entered the 75-year lease. The Congregation agreed to pay the District $3,025,000 over the first five years of the lease. The Congregation made a down payment of $600,000 at the time of execution, and had made two annual payments of $606,250 by March 1989.

WHHO opposed the District's motion for summary judgment and filed a motion for summary judgment in its favor. It pointed out that when the lease was executed, the Congregation represented that it was its intent to develop the parcel for its temple and religious village. WHHO argued that, by the lease, the District acknowledged its investigation and evaluation of the unique capabilities of the Congregation, including its reliance on its financial capability.[3]

---

[3] WHHO relied on language in paragraph 7a of the lease, which provides: "7. *Assignment and Subleasing.* [¶] a. *Assignment by Lessee.* Lessee shall not assign all or any portion of Lessee's interest in the lease without the prior written consent of the District, which the District may withhold in its sole and absolute discretion, but which will not be unreasonably withheld

WHHO argued that the District will be required to be involved in the Congregation's use and development of the parcel, citing paragraphs 10 and 14 of the lease, which require the District to review and make suggestions on the Congregation's proposed temple and other religious buildings, to submit applications to the City of Los Angeles for their construction, and to review the financial capabilities and proposed replacement plans of the Congregation in the event it decides to remodel, alter, or improve its temple or religious buildings.

WHHO claimed that the District did not determine the fair market rental of the parcel for a 75-year period. A neighboring 3.3-acre parcel, zoned for single-family residential use at the time of the appraisal, had been appraised in 1983 at $450,000, reappraised in January 1986 at $720,000, and ultimately sold one year later for $1.1 million.

It asserted the public offering was preceded by a seven-month long series of private negotiations between representatives of the District and the Congregation not known publicly until the District produced documents in March 1989. WHHO pointed out that the Congregation informed the District of its intention to sublease more than two-thirds of the parcel for private residential development at the highest density politically feasible. The District staff recognized that the proposed residential complex would be the prime means of financing the lease of the site and that it was unclear what contribution, if any, the religious facilities would make toward lease payments. WHHO asserted that the offering price of $3 million would realize a "present value" about $500,000 less than fair market value.

WHHO claimed that it first became aware of the lease to the Congregation in the spring of 1988. On June 8, 1988, a representative of WHHO presented the District with the organization's concerns and its request to void the lease with the Congregation. The District presented a written response to WHHO's questions and took no action to set aside the lease.

The trial court granted the District's motion for summary judgment, denied WHHO's motion for summary judgment, and denied the Congrega-

---

or delayed. Lessee acknowledges that the District, in entering into this lease, is relying on the financial capability of Lessee, Lessee's interest and experience in projects of the type contemplated for the Leased Premises, the District's investigation and evaluation of the unique capabilities of Lessee, and the continuing involvement of Lessee with regard to the long-term construction, operation and maintenance of the Leased Premises, as improved from time to time. The parties acknowledge that considerations of the District in selecting Lessee were of such a complex and personal nature that a so-called 'reasonable' standard cannot fairly be applied to any proposed assignee to determine whether the District is or is not withholding consent to any particular assignment 'reasonably' or 'unreasonably'. Therefore, Lessee enters into this agreement understanding that Lessee may not be able to assign its interest hereunder throughout the term of the Lease and Lessee agrees that such a restriction under all the facts and circumstances surrounding this transaction is fair, just and equitable."

tion's motion for an award of attorneys' fees incurred in its defense of the action.

WHHO appeals the judgment in favor of the District. The Congregation appeals the denial of its request for attorneys' fees.

## CONTENTIONS

WHHO contends:

1. The District's lease to the Congregation violates the standards of Education Code section 82530 which applies to the lease of the District's land.

2. The District's lease to the Congregation violates the establishment clauses of the United States and California Constitutions.

The District and the Congregation contend: 1. Education Code section 82530 does not apply in this case.

2. Defendant's compliance with Education Code section 81360 et seq. precludes the finding of a gift of public funds or assets.

3. The District has not favored or aided a religion in violation of the federal or state Constitutions.

In addition, the Congregation contends that it is entitled to recover its attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## DISCUSSION

I. *Standard of Review*

■ "The granting of a summary judgment is a drastic remedy, and if there is any issue of material fact to be tried, summary judgment must be denied. [Citation.] The trial court is, however, to some extent required to weigh evidence in determining whether the factual issues asserted relate to a 'material fact,' and must determine what 'inferences [are] reasonably deducible from [the] evidence.' (Code Civ. Proc., § 437c.) This is not simply a process of mechanical sifting of affidavits to determine whether a theoretical issue has been uncovered, regardless of how minor or remote. The trial court judge is entitled and required to utilize discretion in viewing and weighing questions of substance and materiality of asserted disputed facts. [Citations.]" (*Sawyer v. First City Financial Corp.* (1981) 124 Cal.App.3d 390, 406 [177 Cal.Rptr. 398].)

II. ██ ██ ██ *Education Code Section 82530*[4]

██ WHHO contends that the Legislature intended to restrict all religious use of District land to the three conditions imposed by the second paragraph of section 82530.[5]

Pursuant to this provision, the District "may grant the use of college facilities or grounds . . . for the conduct of religious services" on the following conditions: (1) the use is for a "temporary period"; (2) the "church or organization has no suitable meeting place for the conduct of such services"; and (3) the fee must be "an amount . . . equal to the fair market value of the facilities or grounds." (§ 82530, 2d ¶; § 82542, subds. (d) and (f).)

---

[4] All future statutory references are to the Education Code unless otherwise indicated.

The District contends that the issue of the applicability of section 82530 is not before this court because the complaint did not allege violation of this particular provision of the Education Code and WHHO made no motion to amend the complaint to include this claim. WHHO did in fact move to amend the complaint when it filed its reply memorandum two weeks before the hearing on the summary judgment motions.

As the court stated in *Krupp* v. *Mullen* (1953) 120 Cal.App.2d 53, 57 [260 P.2d 629], relied upon by the court in *Metromedia, post,* " 'If either party finds, on the hearing of such a motion [for summary judgment], that his pleading is not adequate, either by way of allegation or denial, the court may and should permit him to amend; but in the absence of some request for amendment there is no occasion to inquire about possible issues not raised by the pleadings.' " In this action, WHHO requested amendment. (See also, *Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 794 [101 Cal.Rptr. 358].)

Although apparently unaware of this motion before the hearing, the trial court impliedly granted the motion and heard argument on the section 82530 claims. The parties argued the matter and the trial court considered and ruled on the issue. The parties have extensively briefed the issue on appeal. Accordingly, the issue is before us for review. (*Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 885 [164 Cal.Rptr. 510, 610 P.2d 407], reversed on other grounds, 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882].)

[5] Section 82530 provides: "The governing board of any community college district may grant the use of college facilities or grounds for public, literary, scientific, recreational, educational, or public agency meetings, or for the discussion of matters of general or public interest upon such terms and conditions as the board deems proper, and subject to the limitations, requirements, and restrictions set forth in this article. [¶] The governing board of any community college district may grant the use of college facilities or grounds to any church or religious organization for the conduct of religious services for temporary periods where such church or organization has no suitable meeting place for the conduct of such services upon such terms and conditions as the board deems proper, and subject to the limitations, requirements, and restrictions set forth in this article. The governing board shall charge the church or religious organization using such property for the conduct of religious services a fee as specified in subdivision (d) of Section 82542."

Subdivisions (d) and (f) of section 82542 provide:

"(d) The governing board of any college district which authorizes the use of college facilities or grounds for the purpose specified in the second paragraph of Section 82530 shall charge the church or religious denomination an amount at least equal to the fair rental value of the facilities or grounds.

"(f) As used in this section, 'fair rental value' means the direct costs to the district, plus the amortized costs of the college facilities or grounds used for the duration of the activity authorized."

The District contends that section 82530 does not apply, and that the District properly leased the parcel pursuant to section 81360, which authorizes the long-term lease of surplus college real property.[6] The District argues that WHHO's interpretation of section 82530 would effectively preclude long-term leasing to any church or religious organization in violation of equal protection guaranties.

■ "In construing a statute 'we begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.]" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 69 [170 Cal.Rptr. 817, 621 P.2d 856].)

■ " 'Where possible, all parts of a statute should be read together and construed to achieve harmony between seemingly conflicting provisions rather than holding that there is an irreconcilable inconsistency. [Citations.]' (*Wemyss* v. *Superior Court* (1952) 38 Cal.2d 616, 621 [ ].)" (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].)

In their current versions as applied to community colleges, these two provisions exist in different chapters of the relevant code. Community colleges are regulated by the provisions of part 49 of the Education Code, section 81000 et seq. Section 81360 is found in chapter 2, entitled "Property—Sale, Lease, Use and Exchange," while section 82530 is an article entitled "Use of School Property, Public Purposes," in the "Miscellaneous" chapter, at the end of the code.

Since before the adoption of the School Code in 1929, the Legislature has authorized school boards to sell or lease for a term not exceeding 99 years any real property no longer needed for school use. (Former Sch. Code, § 6.170, derived from Pol. Code, § 1617½, Stats. 1917, ch. 785.)

For the same extensive period, school boards have been authorized to grant the use of "school buildings or grounds" for "public, literary, scientific, recreational or educational meetings, or for the discussion of matters of general or public interest." (Former Sch. Code, § 6.740; see Stats. 1917, ch. 552, p. 741, § 12.) Such use cannot be "inconsistent with the use of said buildings or grounds for school purposes, nor interfere with the regular

---

[6] Section 81360 provides: "The governing board of a community college district may sell any real property belonging to the district or may lease for a term not exceeding 99 years, any real property, together with any personal property located thereon, belonging to the district which is not or will not be needed by the district for school classroom buildings at the time of delivery of title or possession. The sale or lease may be made without first taking a vote of the electors of the district, and shall be made in the manner provided by this article."

conduct of school work, nor be granted in such manner as to constitute a monopoly for the benefit of any person or organization." (Former Sch. Code, § 6.741; see Ed. Code, §§ 82531, 82532.)[7]

Language permitting short-term use of school facilities by *religious* organizations was not added until 1963. (Stats. 1963, ch. 2154, p. 4497, § 1, amending the predecessor of § 82530, former Ed. Code, § 16551.)

■ There is nothing in the history of this legislation to suggest the Legislature intended to extend the conditions imposed upon the short-term use of school buildings and grounds by religious organizations (§ 82530, 2d ¶) to the sale or long-term lease of surplus real property (§ 81360). The 1963 enactment addressed concerns over the constitutionality of allowing religious groups to use public school buildings free of charge, as other groups were allowed to do. (See 25 Ops.Cal.Atty.Gen. 309 (1955).)[8]

Surplus land is not the equivalent of college "facilities or grounds" as that term is used in section 82530. The District found that the parcel was no longer needed for educational purposes. This surplus parcel is not forever subject to the use restrictions of section 82530 simply because it was once used by the college and lies adjacent to the active college facilities.

We find that section 82530 does not apply to the District's lease of the parcel to the Congregation. However, the District's compliance with the provisions of section 81360 does not automatically render the action constitutional. We therefore turn to the establishment clause issues.

III. *Constitutional Requirements*

A. *The Establishment Clause of the United States Constitution*

In what the United States Supreme Court has described as an "extraordinarily sensitive area of constitutional law," "we can only dimly perceive the lines of demarcation," between permissible and forbidden state action involving religious institutions. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105].)

---

[7] In 1917, the grant of use could not exceed a period of one year. Pursuant to the current code, section 82533, the grant cannot exceed five years.

[8] In response to inquiries, including whether a high school auditorium and stage could be leased to a religious organization for evening use for a total period of one week, the Attorney General concluded that a long-term lease of surplus public property was proper pursuant to Education Code sections 18601-18614 (from which § 81360 was derived), but that there was no statutory authority for temporary leases of school buildings and grounds to *anyone* at all. (25 Ops.Cal.Atty.Gen. 309, 314, 315 (1955).) See footnote 13, *infra*.

The establishment clause of the First Amendment of the United States Constitution commands "no law *respecting* an establishment of religion." "A law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." (403 U.S. 602, 612.)

██ The establishment clause was intended to afford protection against three main evils: "sponsorship, financial support, and active involvement of the sovereign in religious activity." (*Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].)

The United States Supreme Court has articulated the "cumulative criteria" employed in evaluating an alleged violation, developed over many years of decisionmaking. (403 U.S. 602, 612.) "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education* v. *Allen,* 392 U.S. 236, 243 []; finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz, supra,* at 674." (*Lemon, supra,* 403 U.S. at pp. 612-613 [29 L.Ed.2d at p. 755].)

### B. The California Constitution

Article I, section 4, of the California Constitution guarantees free exercise and enjoyment of religion "without discrimination or preference" and also prohibits any law "respecting an establishment of religion." ██ Because of the prohibition against any "preference," California courts have suggested that this provision is broader or more comprehensive than the federal establishment clause. (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663] [illumination of a huge cross on the city hall was invalid preference]; *Feminist Women's Health Center, Inc.* v. *Philibosian* (1984) 157 Cal.App.3d 1076, 1092 [203 Cal.Rptr. 918], cert. den. (1985) 470 U.S. 1052 [84 L.Ed. 2d 816, 105 S.Ct. 1752]; *Christian Science* v. *City & County of San Francisco* (9th Cir. 1986) 784 F.2d 1010, 1015.)

In addition, the California Constitution expressly forbids the Legislature, city, county or school district to "grant anything to or in aid of any religious sect, church, creed, or sectarian purpose."[9]

---

[9] Article XVI, section 5 provides: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college,

■ It has been observed that this provision, "admits of no de minimis exception. . . . The ban is on aid to religion in *any* form." (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 806 (conc. opn.).) "The section [formerly article XIII, section 24] has never been interpreted, however, to require governmental hostility to religion, nor to prohibit a religious institution from receiving an indirect, remote, and incidental benefit from a statute which has a secular primary purpose. [Citation.] In *Bowker* v. *Baker* (1946) [ ] 73 Cal.App.2d 653, 666, the court recognized that 'many expenditures of public money give indirect and incidental benefit to denominational schools and institutions of higher learning. Sidewalks, streets, roads, highways, sewers are furnished for the use of all citizens regardless of religious belief. . . . Police and fire departments give the same protection to denominational institutions that they give to privately owned property and their expenses are paid from public funds.' " (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605 [116 Cal.Rptr. 361, 526 P.2d 513].)[10]

With these principles in mind, we carefully scrutinize the facts of the particular transaction challenged by WHHO.

IV. *The District's Lease of Surplus Property to the Congregation*

A. *Advancement of Religion*

■ WHHO contends that the lease and the report on which the Board acted to enter the lease evidence a clear advancement of the Congregation's religious cause.

There is no evidence in the record that the District's lease advances or aids Judaism or religion generally. The District never took a stance, publicly *or* privately, favoring the Congregation over other religious groups or favoring the letting of the parcel only to a religious group. WHHO mistakenly equates the District's *acknowledgment* of the Congregation's general

university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI [appropriation of public money and aid to private institutions for hospital facilities, orphans, disabled children, the blind, etc.]."

[10] Although *Priest* involved a private university not affiliated with any religious denomination, in *California Teachers Assn.* v. *Riles* (1981) 29 Cal.3d 794, 806 [176 Cal.Rptr. 300, 632 P.2d 953], footnote 10, the California Supreme Court observed that, in dictum, it did not so limit its opinion.

principles and the specific plans for development of the parcel[11] to a *policy* of state endorsement and advancement of religion.[12]

The primary purpose of the District's lease is secular, designed to provide the District with financial resources from surplus property. The District had established that the anticipated return on the long-term lease would far exceed the market price suggested by WHHO. Any benefits to the Congregation, other than the ordinary consequences resulting from the lease of real property, which happen to benefit the lessee in a religious or philosophical manner, are incidental. Such incidental benefits, which may result from such transaction, do not constitute an improper advancement of religion in violation of the federal and state Constitutions.

WHHO also contends that the District's action places its imprimatur upon the Congregation's religious activity. *Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1, 13 [137 Cal Rptr. 43], relied upon by WHHO, is inapposite. In that case a school district denied the application for formal recognition of a club whose express purpose was to enable those participating to know God better by prayerfully studying the Bible. The court held that the denial was proper in light of the facts that the religious club, if permitted to operate, would not only receive financial aid but would enjoy its sponsorship, and "as such [would] be entitled to use the school name in connection with its activities, to free use of school premises and property, to access to the school newspaper and school posting facilities to advertise its activities, and to solicit contributions on campus during the school day." ▮ ▮▮ ▮ ▮ There is no evidence here that the

---

[11] The philosophical statement prepared by the Congregation stated: "[The Congregation] is a synagogue committed to perpetuating Jewish values and institutions. Integral to these values is the belief that in order for us to flourish, the entire community must flourish. . . . [¶] This land can be a model of community planning that can demonstrate the ability of people regardless of their diversity to come together to build a community." The proposed project was described as "a mixed use 'village' concept which incorporates a temple and meeting rooms to serve the Congregation and the community. There will also be housing and community support services facilities."

[12] WHHO cites to the District's statement, in response to WHHO's questions about the lease: "The District is not 'promoting' a mixed use proposal. The District has leased the site to a lessee who hopes to develop it for religious, educational, and senior citizens housing. The District supports development for those purposes, to the extent this type of development is approved by the City of Los Angeles." WHHO also points to language in which the District refers to "the complex and personal nature" of the Congregation and its proposal. The nonassignability term of the lease simply states: "The parties acknowledge that considerations of the District in selecting Lessee were of such a complex and personal nature that a so-called 'reasonable' standard cannot fairly be applied to any proposed assignee . . . ." (See fn. 3, *supra.*)

lease results in any kind of governmental sponsorship or promotion of the Congregation's religious objectives.[13]

Also, contrary to WHHO's contentions, the District's actions did not violate constitutional standards by granting the Congregation exclusive use of the property for a long term. The evidence established that religious and secular groups had equal opportunity to obtain the government benefit. (See *Christian Science* v. *City & County of San Francisco, supra*, 784 F.2d 1010, 1014.) Nor is there any requirement that the District convert surplus property, not used for college facilities, into a "public forum," available for short-term use only. (Cf. *Widmar* v. *Vincent* (1981) 454 U.S. 263 [70 L.Ed.2d 440, 102 S.Ct. 269].)

B. *Entanglement*

Pursuant to the terms of the lease, the District has authority to review the Congregation's financial capabilities and plans to alter, remodel or improve the parcel. These administerial rights of a landlord, however, do not cause impermissible entanglement in the religious affairs of the Congregation. As the United States Supreme Court observed in *Lemon* v. *Kurtzman, supra*, 403 U.S. 602, at page 614 [29 L.Ed.2d at pages 756-757], "Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. [Citations.] Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contacts. Indeed, under the statutory exemption before us in *Walz* [v. *Tax Commission* (1970) 397 U.S. 664] the State had a continuing burden to ascertain that the exempt property was in fact being used for religious worship. Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

---

[13] As recognized by the Attorney General: "A lease to the highest bidder is no more a preference than is a sale to the highest bidder. In each case religious organizations are entitled to equal treatment at the hands of the State and in each case the State benefits financially by accepting the highest bid.

". . . The mere fact that a building is leased from a county and is adjacent to other county buildings does not necessarily indicate county endorsement of the activities there carried on. . . . Especially where such a lease is for a period of years, we think a clear separation between the county's and the lessee's interests can be established. If a lease of public property can be made to a business organization without indicating public endorsement of the products sold by that organization, we believe that similar leases to religious organizations would not necessarily involve religious endorsement." (25 Ops.Cal.Atty.Gen. 314 (1955).)

### V. *Attorneys' Fees*

 In its cross-appeal, the Congregation challenges the trial court's denial of its motion for attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

Section 1021.5 of the Code of Civil Procedure provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

 Not only a plaintiff, but a defendant, other than a public entity, forced to litigate an action regarding "an important right affecting a public interest," is entitled to such an award when it is the "successful party" and meets the statutory criteria. (*County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 869 [223 Cal.Rptr. 846]; see also, *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287 [255 Cal.Rptr. 704].)

The trial court denied the award of attorneys' fees, ruling that the action "was brought and defended for purely selfish purposes, did not materially affect any public interest and conferred no significant benefit upon the public or upon anyone other than the parties."

 The Congregation contends that the "admission" by WHHO that this was "a private attorney general" action required the trial court to award the Congregation fees as the successful party. This contention is meritless. WHHO's position that it acted as a private attorney general is a legal contention, not an admission of "fact" binding on the trial court. (Cf. *Back* v. *Hook* (1951) 107 Cal.App.2d 250, 252 [236 P.2d 910].)

The resolution of issues raised by every legal action benefits the general public to some extent, in the sense that every judicial decision is the application, clarification or the development of the law. This is profoundly so when the issues concern such fundamental constitutional principles as the separation of church and state. However, where the result of the litigation is judicial approval of a challenged governmental action, the defense of which

was in the pecuniary interest of the defendant litigating alongside the governmental entity, it is difficult to satisfy the requirement of Code of Civil Procedure section 1021.5, i.e., that the defense by the private litigant was necessary and that the financial burden resulting from its defense is appropriately shifted to the plaintiff. (See *City of Sacramento* v. *Drew, supra,* 207 Cal.App.3d 1287; cf. *County of San Luis Obispo* v. *Abalone Alliance, supra,* 178 Cal.App.3d 848, 868.) The record fails to reveal that the trial court abused its discretion in denying the Congregation's motion for attorneys' fees.

### CONCLUSION

Aware of the importance of the issue of the separation of church and state so basic to the fundamental freedoms of citizens of a democracy and the thorny question of governmental entanglement, we have examined the transaction between the Congregation and District with close scrutiny. Upon the record before us, we find no constitutional or any other impropriety.

Judgment affirmed. The denial of the Congregation's motion for an award of attorneys' fees is affirmed. The parties are to bear their own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied May 23, 1990. Arabian, J., did not participate therein.