TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 97-809 |
| of | : | |
| | : | June 2, 1998 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney | : | |
| General | | |
| | : | |

_____

THE HONORABLE STEVE BALDWIN, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following questions:

1.     May a private nonprofit religious school deny admission to a student solely on the basis that the student's religious beliefs are inconsistent with the religious beliefs of the school?

2.     May a city lease a public building to a private nonprofit religious school without requiring that the school be open to all religious beliefs of prospective students?

3.     May a city refuse to lease a public building to a private nonprofit religious school solely on the basis that the school is not open to all religious beliefs of prospective students?

CONCLUSIONS

1.     A private nonprofit religious school may deny admission to a student solely on the basis that the student's religious beliefs are inconsistent with the religious beliefs of the school.

2.     A city may lease a public building to a private nonprofit religious school without requiring that the school be open to all religious beliefs of prospective students.

3.     A city may not refuse to lease a public building to a private nonprofit religious school solely on the basis that the school is not open to all religious beliefs of prospective students.

ANALYSIS

1.      Denying Student Enrollment

The first question presented for analysis is whether a private nonprofit religious school may deny admission to a student solely because the student's religious beliefs are in conflict with the religious beliefs of the school. We conclude that the school may do so.

We note initially that a private nonprofit religious school is not part of the public school system required by the Constitution. (Cal. Const., art. IX, § 5.) If a private full-time day school has filed the requisite private school affidavit (see Ed. Code, § 33190), students attending the school are exempt from public school attendance (see Ed. Code, §§ 48200, 48222).

We also note that a private school normally would not be subject to either the equal protection clause of the Fourteenth Amendment of the United States Constitution **Footnote No. 1** or its California equivalents (Cal. Const., art. I, § 7). **Footnote No. 2** As explained by the court in *Air Line Pilots Ass'n* v. *Dept. of Aviation* (7th Cir. 1995) 45 F.3d 1144, 1149: "As a general rule, the conduct of private parties lies beyond the Constitution's scope." The court, however, enumerated four situations where "governmental authority dominates an activity to such an extent that its participants must be deemed to act with the authority of the state, [and] constitutional restraints apply." (*Ibid*.) These are (1) where there is a "'symbiotic relationship' between the private actor and the state," (2) "where the state commands or encourages the private discriminatory action," (3) "when a private party carries on a traditional public function," and (4) "when the involvement of governmental authority aggravates or contributes to the unlawful conduct." (*Ibid*.)

Of these four tests, it might superficially appear that a private religious school "carries on a traditional public function" for purposes of constitutional analysis. However, this test is applicable only when the state delegates to a private party public functions under circumstances that leave no alternative source of benefits for its citizens. (See *Flagg Bros., Inc.* v. *Brooks* (1978) 436 U.S. 149, 157-164.) Such is not the case with respect to private schools, religious or otherwise; California has its own system of public schools for its citizens. Accordingly, we find no constitutional impediment under the equal protection clause with respect to a private nonprofit religious school denying admission to a prospective student solely because his or her religious beliefs are inconsistent with the religious beliefs of the school.

Indeed, we find constitutional language that generally protects the school's decision to exclude those who do not subscribe to its religious beliefs. The "religion clauses" are contained in the First Amendment of the United States Constitution: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." **Footnote No. 3** California has its own constitutional counterparts: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion . . . ." (Cal. Const., art. I, § 4.)

In *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1112-1113, the court explained the principles to be applied in analyzing the religion clauses:

"The religion clauses protect only claims rooted in religious belief. [Citation.] The free exercise clause protects religious beliefs absolutely. [Citation.] While a court can inquire into the *sincerity* of a person's beliefs, it may not judge the truth or falsity of those beliefs. [Citation.] The government may neither compel affirmation of a religious belief [citation], nor penalize or discriminate against individuals or groups because of their religious beliefs [citation], nor use the taxing power to inhibit the dissemination of particular religious views. [Citation.]

"However, while religious *belief* is absolutely protected, religiously motivated *conduct* is not. [Citations.] Such conduct 'remains subject to regulation for the protection of society.' [Citation.] Government action burdening religious conduct is subject to a balancing test, in which the importance of the state's interest is weighed against the severity of the burden imposed on religion. [Citation.] The greater the burden imposed on religion, the more compelling must be the government interest at stake. [Citations.] A government action that passes the balancing test must also meet the further requirements that (1) no action imposing a lesser burden on religion would satisfy the government's interest and (2) the action does not discriminate between religions, or between religion and nonreligion. [Citation.]"

The religion clauses were more recently described in *Rowe* v. *Superior Court* (1993) 15 Cal.App.4th 1711, 1725, as follows:

". . . Commonly referred to as the establishment and free exercise clauses, they together permit and require that government maintain a 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.' [Citation.]

"The 'benevolent neutrality' required by the First Amendment involves a delicate balance between the avoidance of sponsorship on the one hand and interference on the other. The United States Supreme Court has noted that the two religion clauses exist in 'tension' with one another [citations] and has 'struggled to find a neutral course between [them], both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other.' [Citation.]"

The free exercise clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" (*Employment Div., Ore. Dept. of Human Res.* v. *Smith* (1990) 494 U.S. 872, 879, quoting *United States* v. *Lee* (1982) 455 U.S. 252, 263, fn. 3.) **Footnote No. 4**

Here, not only is the free exercise clause implicated, so also is the constitutional right to associate with those of similar beliefs. "Congress shall make no law . . . prohibiting . . . the right of the people peaceably to assemble . . . ." (U.S. Const., 1st Amend.) "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 622.) In *Widmar* v. *Vincent,*

*supra*, 454 U.S. at 269, the court recognized religious worship and discussion as "forms of speech and association protected by the First Amendment. [Citations.]" Clearly, the operation of a private nonprofit religious school implicates constitutional rights of the free exercise of religion, speech, and association.

With these constitutional freedoms and rights in mind, we examine whether there is a "valid and neutral law of general applicability" that would prevent a private religious school from denying admission to a student with contrary religious beliefs. Only one statute appears to require analysis, the Unruh Civil Rights Act (Civ. Code, § 51; "Act"). **Footnote No. 5** Section 51 states in part:

"All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

In interpreting the language of section 51, we apply well established rules of statutory construction. "'Statutes must be construed so as to give a reasonable and common-sense construction consistent with the apparent purpose and intention of the law makers - a construction that is practical rather than technical, and will lead to wise policy rather than mischief or absurdity. [Citation.]'" (*People* v. *Turner* (1993) 15 Cal.App. 4th 1690, 1696; see also *Harris* v. *Capitol Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166.) "'Judicial doctrine governing construction of a law to avoid unconstitutionality is well settled. If "the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than one in conflict with the Constitution."'" (*Rowe* v. *Superior Court*, *supra*, 15 Cal.App.4th at 1722.)

Recently the California Supreme Court examined the requirements of the Act with respect to membership in the Boy Scouts of America. (*Curran* v. *Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670.) After reviewing the legislative history of the statute and prior judicial decisions, the court observed:

". . . [A]lthough past California decisions demonstrate that the Act clearly applies to any type of for-profit commercial enterprise, and to nonprofit entities . . . whose purpose is to serve the business or economic interests of its owners or members, no prior decision has interpreted the 'business establishments' language of the Act so expansively as to include the membership decisions of a charitable, expressive, and social organization, like the Boy Scouts, whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members. (See, e.g., *Hart* v. *Cult Awareness Network* (1993) 13 Cal.App.4th 777 [organization established to educate the public about the harmful effect of cults is not a business establishment for purposes of the Unruh Civil Rights Act].) In our view, given the organization's overall purpose and function, the Boy Scouts cannot reasonably be found to constitute a business establishment whose membership decisions are subject to the Act." (*Id*., at p. 697; fn. omitted.)

The court described the Boy Scouts' educational function as particularly significant in finding that the organization was not a "business establishment" for purposes of the Act:

". . . The record establishes that the Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and activities are complementary to the organization's primary purpose. . . . Scouts meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty, and scouts are required to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes." (*Id.*, at pp. 697-698.)

Similarly, here, a private nonprofit religious school has as its "overall purpose and function" the education of children in keeping with its religious beliefs. The "inculcation of a specific set of values," with programs "designed to teach the moral principles to which the [school] subscribes," prevents such a school from being considered a "business establishment" whose student admission practices would be subject to the Act. **Footnote No. 6** Such construction of the Act is consistent with the requirements of the Constitution. (See *Curran* v. *Mount Diablo Council of the Boy Scouts*, *supra*, 17 Cal.4th at 722-729 (conc. opn. of Kennard, J.).)

No other constitutional or statutory provision appears to be relevant to our discussion. We thus conclude that a private nonprofit religious school may deny admission to a student solely on the basis that the student's religious beliefs are inconsistent with the religious beliefs of the school.

2.      Leasing City Property

The second question presented is whether a city may lease a public building to a private nonprofit religious school without requiring the school to be open to all religious beliefs of prospective students. We conclude that a city may do so.

For our purposes we may assume that (1) the city has made the public building available to all private organizations or persons who might wish to utilize it, (2) the city has not restricted the building's use to religious schools, and (3) the lease has been negotiated in an arms-length transaction showing no preference to the religious school and for an adequate consideration.

A city may generally lease property to private individuals or organizations. (See Cal. Const., art. XI, §§ 3, 5; Gov. Code, §§ 37350, 37380, 37395.) The issue to be resolved is whether the establishment clause of the First Amendment of the United States Constitution and its California counterpart, as quoted above, require a city to lease its property for a school only upon the condition that the school be open to all religious beliefs. Under the establishment clause, recent case law has focused upon whether the alleged violation may be construed as an "endorsement" of a particular religion. (See *Hawley* v. *City of Cleveland* (6th Cir. 1994) 24 F.3d 814, 822.)

In *Christian Science* v. *City and County of San Francisco, supra*, 784 F.2d 1010, the Ninth Circuit Court of Appeals considered whether the San Francisco Airport Commission could lease

space at the San Francisco Airport for a Christian Science Reading Room. The court found that the commission's prior policy of allowing the religious group to rent space at the airport was purely secular, to obtain revenue, since (1) a standard lease was used that applied to all tenants, (2) the rent schedule was one that applied to all tenants, (3) the transaction was an arms-length real estate transaction without additional motivation, and (4) there was no purpose to advance religion. (*Id*., at p. 1014.) The religious benefit received by the group in operating the reading room was determined by the court to be only "incidental" and thus permissible under *Widmar* v. *Vincent*, *supra*, 454 U.S. at 273-274. (*Ibid*.) Finally, the court pointed out that there were no "entanglements" with religion since the commission did not tell the religious group how to run its reading room, and the religious group did not tell the commission how to run the airport. (*Id*., at p. 1015; see also generally, *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 695.) The court upheld the lease under both federal and state Constitutions on the basis that the commission's prior policy did not favor or prefer any religion or religion as a whole and did not have the direct, immediate, or substantial effect of promoting religious purposes. (*Id*., at pp. 1014-1015; see also *California Teacher's Association* v. *Riles* (1981) 29 Cal.3d 794, 806; 25 Ops.Cal.Atty.Gen. 309 (1953).)

Likewise, in *Woodland Hills Homeowners Organization* v. *Los Angeles Community College District* (1990) 218 Cal.App.3d 79, the court concluded that a lease of surplus property by a school district to a religious group did not violate either the federal or state Constitutions. The surplus property was offered by competitive bid for general uses, including "institutional, community or residential purposes," and the religious group was the sole bidder. The court found that (1) the purpose of the lease was to generate revenue for the school district, (2) there was no governmental sponsorship or promotion of religious objectives by virtue of the lease since all religious and secular groups had an equal opportunity to lease the property, and (3) any "entanglements" were merely those which usually occur between a landlord and tenant. (*Id*., at pp. 94-95.) The court noted that the California Constitution "has never been interpreted . . . to require governmental hostility to religion, nor to prohibit a religious institution from receiving an incidental benefit from a statute which has a secular primary purpose." (*Id*., at p. 93.)

These California cases are supported by cases in other jurisdictions. In *Brashich* v. *Port Auth. of New York* (S.D.N.Y. 1979) 484 F.Supp. 697, affirmed (2d Cir. 1980) 628 F.2d 1344, 791 F.2d 224, the court approved the placing of three religious chapels at John F. Kennedy Airport. The court concluded that although "the Port Authority has made accommodations for religion, it has not established religion." (*Id*., at p. 704.) The same conclusion was reached by the court in *Hawley* v. *City of Cleveland*, *supra*, 24 F.3d 814, where the city leased space for a Catholic chapel at the Cleveland Hopkins International Airport. The court concluded:

". . . [T]he chapel serves the secular purpose of accommodating the religious needs of travellers and providing them with a place for rest and comfort. Moreover, because a reasonable observer would not conclude that the city endorses religion by allowing the diocese to maintain the chapel, the chapel's lease and its authorizing ordinance do not constitute an endorsement of religion, and thus their primary effect is one that neither advances nor inhibits religion. We find, finally, that the chapel's lease and its authorizing ordinance also do not foster an excessive government entanglement with religion. Accordingly, the lease and the ordinance do not violate the Establishment Clause of the First Amendment. (*Id*., at p. 822, fn. omitted.)

Here, we believe that a lease of a public building to a private nonprofit religious school in an arms-length transaction without preference being given to religion *per se* would not constitute a violation of either the federal or state Constitutions. (See 45 Ops.Cal.Atty.Gen. 89 (1965); 43 Ops.Cal.Atty.Gen. 62 (1964); 25 Ops.Cal.Atty.Gen. 309, *supra*.) As reaffirmed by the United States Supreme Court in *Corporation of Presiding Bishop v. Amos* (1987) 483 U.S. 327, 334:

"'This court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' . . . There is ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interferences.' . . ."

We conclude that a city may lease a public building to a private nonprofit religious school without requiring that the school be open to all religious beliefs of prospective students.

3.      Refusing to Lease City Property

The final question presented is whether a city may refuse to lease a public building to a private nonprofit religious school solely on the basis that the school is not open to all religious beliefs of prospective students. We conclude that the city may not so refuse.

With respect to the equal protection clause of the federal Constitution, it is evident that the city's leasing policy would divide potential private religious school lessees into two groups: those who would not allow admission to students of all religious beliefs, and those who would. Whether a city may make such a division is not easily resolved. In what the United States Supreme Court has characterized as an "extraordinarily sensitive area of constitutional law," "we can only dimly perceive the lines of demarcation" between permissible and impermissible government action involving religious institutions. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612.)

On the one hand, the city's interests would include preventing religious discrimination on public property, fostering educational opportunities for all students, and avoiding giving the city's "imprimatur of approval" to the school's religious creed, whatever it might be. The establishment clause "prohibits government from appearing to take a position on questions of religious belief . . . ." (*Id.*, at pp. 593-594; see *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah* (1993) 508 U.S. 520, 532-533; *Allegheny County* v. *Greater Pittsburgh ACLU* (1989) 492 U.S. 573, 605; *Corporation of Presiding Bishop* v. *Amos, supra,* 483 U.S. at 335; *Woodland Hills Homeowners Organization* v. *Los Angeles Community College Dist.*, *supra*, 218 Cal.App.3d at 92-93.)

On the other hand, the interests of the school officials include, as discussed in answer to the first question, the free exercise of religion clause, the freedom of speech clause, and the freedom of association clause of the state and federal Constitutions. (See *Widmar* v. *Vincent*, *supra*, 454 U.S. at 269-270.)

Weighing these competing interests, we find that although a state or local government may not discriminate against religious groups, a religious group is not subject to the same

requirement, even when on public property. While the city may wish to foster educational opportunities, the public school system, including charter schools, is available as an alternative, as well as other religious schools that accept students of all religious faiths. **Footnote No. 7** Moreover, as discussed above, courts have rejected the claim that an arm's-length lease of public property to a religious group gives the government's "imprimatur of approval" and "endorsement" to the religious beliefs of the group. (See *Hawley* v. *City of Cleveland*, *supra*, 24 F.3d at 822; *Christian Science* v. *City and County of San Francisco*, *supra,* 784 F.2d at 1014-1017; *Brashich* v. *Port Auth. of New York*, *supra*, 484 F.Supp. at 703; *Woodland Hills Homeowners Organization* v. *Los Angeles Community College Dist.*, *supra*, 218 Cal.App.3d at 94-95.)

While the issue is not free from doubt, we believe that a court would side with the private religious school officials' free exercise of religion, speech, and association constitutional rights, regardless of which balancing test (the compelling state interest test or rational basis test) is used. (See *Christian Science* v. *City and County of San Francisco*, *supra*, 784 F.2d at 1012-1013.)

In answer to the third question, therefore, we conclude that a city may not refuse to lease a public building to a private nonprofit religious school solely on the basis that the school is not open to all religious beliefs of prospective students.

\* \* \* \* \*

---

**Footnote No. 1**
"No state shall make or enforce any laws which shall . . . deny to any person within its jurisdiction the equal protection of the laws."
**Footnote No. 2**
California courts have interpreted these provisions in the same manner as federal courts have interpreted the Fourteenth Amendment. (See *Dept. of Mental Hygiene* v. *Kirshner* (1965) 62 Cal.2d 586, 588; *In re Evans* (1996) 49 Cal.App.4th 1263, 1270; *Reece* v. *Alcoholic Bev. Etc. Appeals Bd.* (1976) 64 Cal.App.3d 675, 679.)
**Footnote No. 3**
These federal constitutional protections are enforceable against the states through the Fourteenth Amendment. (See *Everson* v. *Board of Education* (1947) 330 U.S. 1, 8; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304.)
**Footnote No. 4**
"[A] neural law of general application need not be supported by a compelling state interest . . . ." (*People* v. *Peck* (1996) 52 Cal.App.4th 351, 358.) However, if the government burden is upon not only an individual's free exercise of religion right but also upon some other constitutional right such as freedom of speech or freedom of association (U.S. Const., 1st Amend.), a compelling state interest might be required for imposition of the state burden (see *Employment Div., Ore. Dept. Of Human Res.* v. *Smith, supra*, 494 U.S. at 881; *Widmar* v. *Vincent* (1981) 454 U.S. 263, 269-270; *Christian Science* v. *City and County of San Francisco* (9th Cir. 1986) 784 F.2d 1010, 1012-1013; *Smith* v. *Fair Employment & Housing Som.* (1996) 12 Cal.4th 1143, 1164-1165).
**Footnote No. 5**
All references hereafter to the Civil Code are by section number only.
**Footnote No. 6**
The legislative history of the Act fully supports the conclusion that the Legislature intended to exclude religious schools from the purview of the Act. (See *Curran* v. *Mount Diablo Council of the Boy Scouts*, *supra*, 17 Cal.4th at 709-715 (conc. opn. of Mosk, J.).)
**Footnote No. 7**
Indeed, we have not been apprised that a Catholic school *would* deny admission to a Jewish child or a Muslim school *would* deny admission to a Buddhist child. We assume that the question presented has a factual basis.

---