[Nos. G026974, G027732. Fourth Dist., Div. Three. Apr. 10, 2001.]

JERE A. JOBE, Plaintiff and Appellant, v.
CITY OF ORANGE, Defendant and Respondent;
LUTHERAN HIGH SCHOOL ASSOCIATION OF ORANGE COUNTY,
Real Party in Interest and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V.

**COUNSEL**

Maher & Maher and Michael K. Maher for Plaintiff and Appellant.

Van Blarcom, Leibold, McClendon & Mann, Ronald A. Van Blarcom and John G. McClendon for Real Party in Interest and Appellant.

David A. DeBerry, City Attorney, for Defendant and Respondent.

**OPINION**

**O'LEARY, J.**—Jere A. Jobe appeals a judgment denying his petition for writ of mandate (Code Civ. Proc., §§ 1085, 1094.5) seeking to compel the City of Orange (the City) to set aside its approval of the expansion of the Lutheran High School of Orange. He contends the City failed to comply with

the California Environmental Quality Act (CEQA)[1] by preparing a mitigated negative declaration (MND) for the project, rather than a full environmental impact report (EIR). He raises numerous arguments on appeal, none of which have merit, and we affirm.

In a separate appeal, real party in interest Lutheran High School Association of Orange County (LHS), the nonprofit organization which owns and operates the parochial school, complains that it should have been awarded its attorney fees under Code of Civil Procedure section 1021.5 (private attorney general) because it advanced an important public interest in education by successfully defending. We disagree and affirm the postjudgment order denying attorney fees.

I

Lutheran High School is located in a residential zone of the City, where schools are a conditionally permitted use. The high school occupies a 12.82-acre site on Santiago Boulevard, north of Meats Avenue, south of Villa Vista Way, and east of the 55 Freeway.

In 1969, the City granted the original conditional use permit (CUP) allowing construction of the school. The CUP permitted a 76,000-square-foot, two-story building for classrooms and administration, a 7,000-square-foot chapel, a 24,000-square-foot gymnasium, 250 off-street parking spaces, and a maximum enrollment of 1,000 students.

In 1993, the City approved a second CUP allowing installation of lights on an outdoor athletic field. At that time, only a one-story building had been built, containing 26 classrooms as well as administrative and other work spaces, all of which centered around the school's gymnasium. The high school's enrollment was less than 500. The parking lot had 232 spaces.

In 1995, the City approved another CUP permitting an office addition and minor expansion of classrooms. The staff report noted the high school had been built out to a 68,000-square-foot, one-story building. Its enrollment was less than 700 students. The parking lot had 243 spaces.

In 1998, LHS submitted an application for a CUP (CUP No. 2262-99) to further expand the high school facilities. It envisioned enrollment increasing from 682 to 950. It proposed to add a second story to the main building and increase the total square footage from 73,100 to 156,900. The new square

---

[1]Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

footage would add a maximum of 23 additional classrooms and other rooms for independent study and extracurricular activities. The parking lot would be enlarged to about 392 spaces, and eventually LHS would build a new gymnasium. Jobe and other neighbors opposed the application, primarily because of increased traffic and parking problems.

The City prepared the MND (No. 1585-99). It described the project generally as increasing enrollment to 950 students, adding 16 new classrooms, expanding the parking facility, and building a new gymnasium. It found that while the project could have a significant effect on the environment, there would not be one because of revisions.

On January 18, 1999, the City's planning commission adopted a resolution approving the CUP and the MND. As approved, the project included the addition of 23 classrooms, construction of a new gymnasium, modifications to the sports field, including outdoor lighting, and expansion of the parking facility from 250 to 392 spaces. Student enrollment was capped at 950.

Jobe appealed to the city council. He challenged the approval of the CUP for the following reasons: the neighborhood did not need the school, the school would create "special problems" for the neighborhood, aggravate traffic, and negatively impact property values. He challenged the approval of the MND on the grounds "a full [EIR] is required due to the potential of ground water [and] air contamination." He further complained that the traffic study upon which the planning commission relied did not take into consideration the impact of reconstruction of the Meats Avenue overpass over the 55 Freeway. After two public hearings, the city council denied the appeal and approved the CUP and MND.

In April 1999, Jobe filed the instant petition for writ of mandate challenging the approval of the CUP based upon the MND. The petition contained mandamus causes of action, seeking to compel the City to prepare an EIR for the project. It also contained causes of action for declaratory and injunctive relief, seeking to declare all project approvals invalid and prohibit construction until an EIR was prepared, but Jobe subsequently dismissed those causes of action.

Jobe requested the City prepare and lodge the administrative record, which was lodged with the court on October 27, 1999. The hearing on Jobe's petition took place on January 5, 2000. At the hearing, Jobe for the first time presented a request for judicial notice seeking to add to the administrative record. Among the items he sought to present were pages from a "Thomas Guide" map book, his own transcriptions of comments he made at various

city council meetings and letters he had written, geological maps, and newspaper articles. Jobe's request for judicial notice did not contain declarations attesting to the authenticity of any of the material.

On January 10, the trial court asked the parties to stipulate to a site inspection. Jobe's counsel responded with a letter questioning what sort of inspection the court wanted and requesting a hearing on the matter. The trial court withdrew its request. On January 11, the trial court issued its ruling denying the petition. It denied Jobe's request for judicial notice because the items were not authenticated, and it rejected Jobe's procedural complaints. It found substantial evidence supported the City's approval of the project based upon the MND—i.e., there was no substantial evidence supporting a "fair argument" that the project might have a significant effect on the environment.

II-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI

*Denial of LHS's Request for Attorney Fees*

■ LHS appeals a postjudgment order denying its attorney fees. It contends fees should have been awarded under Code of Civil Procedure section 1021.5. We disagree.

Code of Civil Procedure section 1021.5 is a codification of the private attorney general doctrine developed in numerous prior judicial decisions. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) It gives trial courts discretion to award attorney fees to a successful party in "any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.) It specifically precludes an award of attorney fees to a prevailing public entity unless one of the opposing parties is a public entity.

We are aware of no CEQA case in which the real party in interest has been awarded its attorney fees under Code of Civil Procedure section

*See footnote, *ante*, page 412.

1021.5. A leading treatise on CEQA litigation makes the following observation: "Because [Code of Civil Procedure section 1021.5] provides for an award of attorney fees to any successful party, the court may make a fee award to a respondent who prevails in the litigation and otherwise meets the requirements of [Code of Civil Procedure section 1021.5]. [Citation.] [¶] Such a situation rarely arises in CEQA litigation. As amended in 1993 [Code of Civil Procedure section] 1021.5 allows fees to be awarded to a public agency against another public agency. [Citation.] In appropriate circumstances, a prevailing public agency respondent would be entitled to a fee award in a case brought by another public agency. The real party in interest in CEQA litigation is typically motivated by its personal stake in the outcome and thus would usually be disqualified under the burden of private enforcement test [citation]. An award might be available under [Code of Civil Procedure section] 1021.5, however, if a real party in interest is the sponsor of a project that itself advances an important public interest and defends a CEQA proceeding primarily to advance that public interest rather than personal interests." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2000) § 23.131, pp. 1045-1046.)

LHS contends it satisfied all of the requirements of Code of Civil Procedure section 1021.5, and the trial court's refusal to award attorney fees was an abuse of discretion. It argues that in defending the litigation it advanced an important public right—education. It claims that by advocating for the expansion of a parochial school, it conferred a significant benefit on a large class of the *public* because it would be able to educate thousands more students. Furthermore, by *privately* educating those students, it will save the taxpayers the expense of their public education. Finally, it contends the burden of its private enforcement of these rights far outweighs its own "pecuniary" interest in advancing them. It asserts that because it is a nonprofit organization, it has no economic interest in expanding the high school; its primary motivation is to advance the public's interest in education.

LHS relies upon *Hull v. Rossi* (1993) 13 Cal.App.4th 1763 [17 Cal.Rptr.2d 457], the only case we have found in which the successful real parties in interest in a mandamus action were entitled to attorney fees under Code of Civil Procedure section 1021.5. It was not a CEQA case. That case involved an electoral battle concerning the future of a city's water supply. (13 Cal.App.4th at p. 1765.) The real parties in interest had signed ballot arguments appearing in the official voters pamphlet supporting a measure advocating a water desalination plant and opposing a bond measure to fund participation in the state water project. (*Ibid.*) The petitioners, supporters of the bond measure, filed a petition for writ of mandate seeking to have the

real parties in interest's ballot arguments stricken as false and misleading. (*Ibid.*) The city clerk was named as respondent in the petition. The real parties in interest prevailed at trial; the trial court characterized the petition as a SLAPP suit (strategic lawsuit against public participation), i.e., one brought to intimidate and for purely political purposes. (*Id.* at p. 1769.) Nonetheless, the trial court denied attorney fees under Code of Civil Procedure section 1021.5. On appeal, the court reversed, holding that without the extensive defense undertaken by the real parties in interest, the public's right to an accurate impartial analysis of ballot measures would have been violated. (13 Cal.App.4th at p. 1768.)

*Hull v. Rossi, supra,* 13 Cal.App.4th 1763, is easily distinguishable. It simply could not be said that the real parties in interest in that case had any *pecuniary* interest in the competing ballot measures. By contrast, although LHS is a nonprofit organization and may not profit financially from an increased student enrollment in the way a for-profit private school might, it certainly has a significant pecuniary interest in the physical expansion of the high school it owns and operates. The facilities are a significant asset of LHS.

*Woodland Hills Homeowners Organization v. Los Angeles Community College Dist.* (1990) 218 Cal.App.3d 79 [266 Cal.Rptr. 767], although not a CEQA case, is remarkably similar to this case and we agree with its reasoning. In that case, a community college district entered into a long-term lease of surplus property with a religious organization, which intended to develop the property for religious, educational, and private use. An area homeowners association filed a complaint for declaratory and injunctive relief against the district contending, among other things, the lease constituted a gift of public funds and property, violated state law regarding disposition of surplus school property and violated the establishment clauses of the United States and California Constitutions. (*Id.* at p. 88.) The religious organization defended the suit alongside the district and prevailed on summary judgment. (*Id.* at p. 87.) Nonetheless, the trial court denied its application for attorney fees under Code of Civil Procedure section 1021.5 because the action " 'was brought and defended for purely selfish purposes, did not materially affect any public interest and conferred no significant benefit upon the public or upon anyone other than the parties.' " (218 Cal.App.3d at p. 96.)

In affirming, the Court of Appeal noted, "The resolution of issues raised by every legal action benefits the general public to some extent, in the sense that every judicial decision is the application, clarification or the development of the law. This is profoundly so when the issues concern such

fundamental constitutional principles as the separation of church and state. However, where the result of the litigation is judicial approval of a challenged governmental action, the defense of which was in the pecuniary interest of the defendant litigating alongside the governmental entity, it is difficult to satisfy the requirement of Code of Civil Procedure section 1021.5, i.e., that the defense by the private litigant was necessary and that the financial burden resulting from its defense is appropriately shifted to the plaintiff. [Citations.]" (*Woodland Hills Homeowners Organization v. Los Angeles Community College Dist., supra,* 218 Cal.App.3d at pp. 96-97.)

An award of attorney fees under Code of Civil Procedure section 1021.5, requires that the claimant show the cost of its legal victory transcended its personal interest. (*Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1667 [39 Cal.Rptr.2d 189].) LHS made no such showing here. Thus, the trial court did not abuse its discretion by denying attorney fees under Code of Civil Procedure section 1021.5.

The judgment and postjudgment orders are affirmed. The parties shall bear their own costs and attorney fees on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.