133 Cal.Rptr.2d 780 (2003)
108 Cal.App.4th 672
The PEOPLE EX REL. DEPARTMENT OF CONSERVATION et al., Plaintiffs and Appellants,
v.
EL DORADO COUNTY et al., Defendants and Respondents,
Loring Brunius, Real Party in Interest and Respondent,
California Mining Association et al., Interveners and Respondents.
No. C039428.
Court of Appeal, Third District.
May 9, 2003.
As Modified on Denial of Rehearing June 9, 2003.[*]
Review Granted August 13, 2003.
*784 Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, Richard M. Thalhammer, Deputy Attorney General, for Plaintiffs and Appellants.
Louis B. Green, County Counsel, Edward L. Knapp, Chief Assistant County Counsel; The Diepenbrock Law Firm, Mark D. Harrison and Gene K. Cheever, Sacramento, for Defendants and Respondents.
Becker & Runkle and David C. Becker, Cameron, for Real Party in Interest and Respondent.
Bingham McCutchen, David E. Moser and Peter M. Morrisette, San Francisco, for Interveners and Respondents.
MORRISON, J.
At issue in this case is whether the Director of the Department of Conservation (Director) has standing to challenge, by way of a petition for a writ of administrative mandamus, a lead agency's actions in approving reclamation plans and financial assurances for surface mining operations under the Surface Mining and Reclamation Act of 1975 (SMARA) (Pub. Resources Code, § 2710 et seq.), the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), and local land use ordinances. We conclude that given the limited advisory role of the Director under SMARA, and given the ability of the State Mining and Geology Board (the Board) to take over the powers of a lead agency under SMARA, the Director lacked standing to pursue his claims against El Dorado County (the County) and real party in interest Loring Brunius. We affirm the judgment of dismissal.
The trial court awarded over $500,000 in attorney fees under Code of Civil Procedure section 1021.5, the private attorney general statute. We find this award was error, as this lawsuit did not result "in the enforcement of an important right affecting the public interest." (Code Civ. Proc., § 1021.5.) We reverse the order awarding attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND
This case is a reaction to prolonged recalcitrance, both in the delinquency of real party in interest Loring Brunius in bringing his surface mining operations in the County into compliance with SMARA, and the County's failure to enforce the provisions of SMARA.
In 1975, the Legislature enacted SMARA. (Stats. 1975, ch. 1131, § 11, pp. 2793-2803.) SMARA requires that all surface mining operations have an approved reclamation plan and approved financial assurances to implement the reclamation *785 plan. (Pub. Resources Code, § 2770, subd. (a); all further unspecified section references are to this code.) The County, as lead agency, was primarily responsible for ensuring compliance with SMARA in the County. (§ 2774.1, subd. (f).)
Brunius has two surface mining operations in the County, the Weber Creek Quarry and the Diamond Quarry. In the mid 1990's, he was operating both without approved reclamation plans and financial assurances. The statutory deadline for compliance with SMARA had long since expired. Those with existing surface mining operations were to submit reclamation plans by March 31, 1988. (§ 2770, subd. (b).) Unless there is an approved reclamation plan and financial assurances, or unless an appeal of the nonapproval was filed by July 1, 1990, as to reclamation plans, and January 1, 1994, as to financial assurances, continuation of a surface mining operation is prohibited. (§ 2770, subd. (d).)
In response to this situation, both the Director and the Board took actions to enforce SMARA. The Director brought suit against Brunius. A stipulated judgment in June 1995, required Brunius to pay the Director $70,000 in administrative penalties.[1] These penalties would be reduced if Brunius took actions to comply with the law, including submitting proposed reclamation plans, posting interim financial assurances, and obtaining approval for reclamation plans and financial assurances for both mines by certain dates. Brunius failed to comply. In March 1997, the Director sent Brunius notice to cease all mining activity at Weber Creek Quarry and Diamond Quarry. Brunius secured a preliminary injunction against operation of the cease and desist order based on his pending applications for reclamation plans and financial assurances.
Meanwhile, the Board had concluded that the County had knowingly allowed Weber Creek Quarry to operate since 1982 without an approved reclamation plan and since 1994 without approved financial assurances in violation of SMARA. After the County failed to rectify this situation, the Board commenced procedures to assume the powers of a lead agency under SMARA in the County.
Thus, prodded into action, Brunius submitted proposed reclamation plans and financial assurances for both mines. During the review process, the Director submitted extensive comments on the inadequacy of the reclamation plans and financial assurances. On July 24, 1997, the County's Planning Commission approved a mitigated negative declaration, a reclamation plan, and financial assurances for both Weber Creek Quarry and Diamond Quarry.
The Director appealed these approvals to the County's Board of Supervisors. In late August, the Board of Supervisors adopted the mitigated negative declaration for each mine, and approved the reclamation plans and financial assurances.
In separate petitions for a writ of administrative mandamus, the Director sought to vacate the County's approval of the reclamation plans and financial assurances and the mitigated negative declaration as to both Weber Creek Quarry and Diamond Quarry. The Director alleged the reclamation plans and financial assurances were inadequate to comply with SMARA. The major inadequacies included design for erosion control, slope stability analysis, reclamation and stability of the one-half inch minus stockpile, and protection against groundwater contamination. The *786 Director further alleged the County violated CEQA in approving the mitigated negative declarations for each operation. The project descriptions were incomplete; the County failed to determine Brunius's right to mine without a permit; and the County failed to require an environmental impact report to evaluate the elimination of resoiling and revegetation, the inadequacy of financial assurances, the failure to require safety fencing near residential neighborhoods, increased dust and asbestos concerns, the alteration of the stream bank, the impact on the red-legged frog, erosion control, and groundwater contamination. The two cases were consolidated.
In March 1998, the Director filed amended petitions. As to the Weber Creek Quarry, he added a challenge to the County's finding that Brunius had a vested right to operate the mine without a permit or that the County was estopped from enforcing its land use ordinance. As to the Diamond Quarry, the Director contended the County failed to enforce its land use ordinances by allowing Brunius to expand his mining operations without a permit.
The California Mining Association, the Construction Materials Association of California, and the Southern California Rock Products Association (hereafter Interveners), all trade associations, moved to intervene in the action. Interveners argued that the Director exceeded his statutory authority in challenging the County's implementation of SMARA. The application was granted.
The County, Brunius, and Interveners all demurred to the petitions on the basis that the Director lacked standing. The trial court overruled the demurrers, finding the Director's official responsibilities gave him standing to seek judicial review of the action by a lead agency under SMARA. This court denied Interveners' and the County's petitions for a writ of mandate or other relief.
The County and Brunius answered the petitions, raising lack of standing as an affirmative defense. Interveners' complaint in intervention alleged no standing.
The County moved for summary adjudication on the third claim in the Weber Creek Quarry writ. That claim challenged the County's finding that the Weber Creek Quarry was a vested use or that the County was estopped from requiring a permit. The County offered two bases for summary adjudication. First, the Director had no standing; second, the undisputed evidence demonstrated there was substantial evidence to support the County's finding. The trial court granted the motion, finding substantial evidence of a vested right.
In October 2000, over three years after the original petitions were filed, the County moved to dismiss the remainder of the case for delay in prosecution. Alternatively, the County moved to dismiss the CEQA claims for failure to timely request a hearing under section 21167.4. Section 21167.4 requires that petitioner request a hearing within 90 days of filing the petition or be subject to dismissal. Brunius also moved to dismiss. The Director opposed the motion, arguing he timely requested a hearing. He also moved for mandatory relief under Code of Civil Procedure section 473, subdivision (b), on the basis that any failure to set a timely hearing was solely the fault of counsel. The trial court denied the Code of Civil Procedure section 473, subdivision (b) motion and granted the motion to dismiss the CEQA claims.
Briefing was then completed on the remaining claim of whether the County had followed SMARA in approving the reclamation plans and financial assurances. Interveners argued that if the County violated *787 SMARA, the remedy was to go to the Board which could take over the powers of a lead agency. The County, in addition to addressing the merits, argued that a decision for the Director would have the effect of changing his advisory role into an enforcement role contrary to SMARA's regulatory scheme.
In ruling on the petitions, the trial court found the governance issue asserted obliquely by the County and directly and forcefully by Interveners was determinative. The Board, not the Director, had policy authority and the power to take action in the present situation, if warranted. The responsibilities of the Director were primarily advisory and he did not have authority to commence a mandamus proceeding against a lead agency in place of the Board's authority to take over lead agency's powers under section 2774.4. The petitions were dismissed.
The County, Brunius, and Interveners all sought attorney fees under the private attorney general doctrine of Code of Civil Procedure section 1021.5. The Director requested bifurcating the issue of liability for fees or a 60 day postponement for discovery. The court awarded attorney fees as follows: $368,186.50 to the County; $57,951 to Brunius; and $81,076 to Interveners.

DISCUSSION

I. Standing to Assert SMARA Claims
As a preliminary matter, the Director complains that the trial court dismissed the petition based on the Director's lack of standing after overruling a demurrer that raised the same point. The Director suggests the trial court was wrong to consider the issue of standing as the issue was not then before it.
"Standing to sue goes to the existence of a cause of action; that is, whether a plaintiff (or a petitioner) has a right to relief in court. [Citations.]" (Sacramento County Fire Protection Dist. v. Sacramento County Assessment Appeals Bd. (1999) 75 Cal.App.4th 327, 331, 89 Cal.Rptr.2d 215.) A contention that petitioner lacks standing may be raised at any time in the proceeding. (Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 438, 261 Cal.Rptr. 574, 777 P.2d 610.) Thus, not only is it appropriate to review the trial court's decision that the Director lacked standing to assert SMARA claims, it is also appropriate to review the Director's standing to raise CEQA and vested use claims.
To have standing to seek a writ of mandate, a petitioner must be "beneficially interested." (Code Civ. Proc., § 1086.) "The requirement that a petitioner be `beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.]" (Carsten v. Psychology Examining Com. (1980) 27 Cal.3d 793, 796, 166 Cal.Rptr. 844, 614 P.2d 276.) The writ must be denied if the petitioner will gain no direct benefit from its issuance and suffer no direct detriment from its denial. (Waste Management of Alameda County, Inc. v. County of Alameda (2000) 79 Cal. App.4th 1223, 1232, 94 Cal.Rptr.2d 740.) This standard is equivalent to the federal "`injury in fact'" test, "which requires a party to prove by a preponderance of the evidence that it has suffered `an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."' [Citation.]" (Associated Builders & Contractors, Inc. v. San Francisco Airports *788 Com. (1999) 21 Cal.4th 352, 363, 87 Cal.Rptr.2d 654, 981 P.2d 499.)
A plaintiff must plead and prove facts to establish standing. (Tahoe Vista Concerned Citizens v. County of Placer (2000) 81 Cal.App.4th 577, 590-591, 96 Cal. Rptr.2d 880.) To show standing, the pleadings in the second amended petitions refer to the Director and the Department's responsibilities under SMARA, particularly their ability to review and comment on proposals for reclamation plans and financial assurances under section 2774, subdivision (c). "Petitioners, charged with responsibility for and administration of SMARA statewide in accordance with law, have a beneficial interest in ensuring that each lead agency, including El Dorado County, carries out those lead agency responsibilities in accordance with law."
The Director's standing allegations are limited to his role under SMARA in ensuring lead agencies carry out their SMARA responsibilities. To assess the validity of this contention, we begin with a description of the Director and the Board, the two major state players in SMARA, and an overview of the statutory scheme and their roles in it.
Within the Resources Agency is the Department of Conservation (the Department). The head of the Department is an executive officer appointed by the governor, known as the Director. (§ 601.) The Department's work is divided into at least four divisions: mines and geology; oil, gas, and geothermal resources; land conservation; and recycling. (§ 607.)
Also in the Department is the nine-member State Mining and Geology Board. (§ 660.) Eight of the Board members are required to have specialized experience: one must be a mining engineer with experience in mining minerals; one shall have a background in groundwater hydrology, water quality, and rock chemistry; one shall be a representative of local government with experience in urban planning; one shall have background and experience in environmental protection or the study of ecosystems; one must be a registered geologist, geophysicist, civil engineer, or structural engineer with experience in seismology; one shall be a landscape architect with experience in soil conservation or revegetation; and one member shall have background and experience in mineral resource conservation, development, and utilization. (§ 662.) The Board represents the State's interests in the development, utilization, and conservation of mineral resources in California and the reclamation of mined lands, and in federal matters pertaining to mining. The Board also determines, establishes, and maintains an adequate surface mining and reclamation policy. (§ 672.) Although the Director is the head of the Department, he does not control the Board; the Director has no power to amend or repeal any order, ruling, or directive of the Board. (§ 671.)
In adopting SMARA, the Legislature made certain findings: "(a) The Legislature hereby finds and declares that the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety, [¶] (b) The Legislature further finds that the reclamation of mined lands as provided in this chapter will permit the continued mining of minerals and will provide for the protection and subsequent beneficial use of the mined and reclaimed land. [¶] (c) The Legislature further finds that surface mining takes place in diverse areas where the geologic, topographic, climatic, biological, and social conditions are significantly different and that reclamation operations and *789 the specifications therefore may vary accordingly." (§ 2711.)
The Legislature intended to create and maintain an effective surface mining and reclamation policy to prevent or minimize adverse environmental effects, reclaim mined lands to a usable condition which is adoptable to alternative uses, and encourage the production and conservation of minerals while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment. (§ 2712.)
At the heart of SMARA is the requirement that every surface mining operation have a permit, a reclamation plan, and financial assurances. (§ 2770, subd. (a).) Reclamation is "the combined process of land treatment that minimizes water degradation, air pollution, damage to aquatic or wildlife habitat, flooding, erosion, and other adverse effects from surface mining operations, including adverse surface effects incidental to underground mines, so that mined lands are reclaimed to a usable condition which is readily adaptable for alternate land uses and create no danger to public health or safety. The process may extend to affected lands surrounding mined lands, and may require backfilling, grading, resoiling, revegetation, soil compaction, stabilization, or other measures." (§ 2733.) Financial assurances, in the form of surety bonds, irrevocable letters of credit, trust funds, or other forms of financial assurances, are required of every surface mining operation to ensure reclamation in accordance with the approved reclamation plan. (§ 2773.1, subd. (a).) The financial assurances must remain in effect for the duration of the mining operation and until reclamation is complete and shall be made payable to the lead agency and the Department. (§ 2773.1, subd. (a)(2).) The financial assurances may be forfeited if the lead agency or the Board determines the operator is financially incapable of performing reclamation in accordance with the approved reclamation plan, or has abandoned its surface mining operation without commencing reclamation. (§ 2773.1, subd. (b).)
In keeping with the recognition of the diverse conditions throughout the state, SMARA provides for "home rule," with the local lead agency having primary responsibility. A lead agency is usually the city or county. (§ 2728.) The mining operator submits the reclamation plan and financial assurances to the lead agency for review. (§ 2770, subd. (d); § 2772.) The Board, through regulations, specifies minimum statewide reclamation standards. (§ 2773.) A lead agency, however, may permit a mining operation to deviate from these standards, if necessary based on the approved end use. (Cal.Code Regs., tit. 14, § 3700.)
To implement its review of proposed reclamation plans and financial assurances, every lead agency is to adopt ordinances in accordance with state policy. (§ 2774, subd. (a).) The Board shall review these ordinances and certify that they are in compliance with state policy. (§ 2774.3.) If the Board finds deficiencies in the lead agency's ordinance, the Board shall communicate the deficiencies to the lead agency. (§ 2774.5, subd. (a).) After an opportunity to revise the ordinance to comply with state policy, if the Board finds the ordinance is still deficient, the Board shall assume full responsibility for review of reclamation plans. (§ 2774.5, subd. (b).) If the lead agency does not have a certified ordinance, reclamation plans shall be submitted to and approved by the Board. (§ 2774.5, subd. (c).) The Board may amend any reclamation plan that was approved by a lead agency at the time the lead agency's ordinance did not comply with state policy. (§ 2774.5, subd. (c).)
*790 Prior to approving reclamation plans and financial assurances, the lead agency submits the proposals and all supporting documentation, including information from any document prepared, adopted or certified pursuant to CEQA, to the Director for review. (§ 2774, subd. (c).) The Director then may prepare written comments, if he chooses, within 30 days for reclamation plans and 45 days for financial assurances. (§ 2774, subd. (d)(1).) The lead agency shall prepare written responses to the Director's comments, describing disposition of the major issues raised. In particular, the lead agency shall explain in detail why any specific comments and suggestions were not accepted. (§ 2774, subd. (d)(2).) Thus, although the lead agency must evaluate and respond to the Director's comments, it need not always accept them.
If a lead agency fails to approve a reclamation plan or financial assurances, an appeal may be taken to the Board. (§ 2770, subd. (e).)
As originally enacted, SMARA did not contain enforcement provisions. (Stats. 1975, ch. 1131, § 11, pp. 2793-2803.) As the author explained, SMARA did not contain enforcement provisions "because the bill provides for a local regulatory program. Enforcement provisions would be embodied in local ordinances."
In 1990, in response to concerns about deficiencies of lead agencies in carrying out their responsibilities under SMARA, the Legislature substantially amended SMARA. The amendments provided for various types of enforcement, against both mine operators and lead agencies. Enforcement against mine operators includes notices of violations and fines. (§ 2774.1, subds.(a)-(c).) The lead agency has primary responsibility for enforcing SMARA against mine operators. (§ 2774.1, subd. (f)(1).) Where the Board is not acting as the lead agency, the Director may initiate enforcement actions where (1) the Director has notified the lead agency of the violation and the lead agency fails to take action within 15 days, or (2) the Director determines the violation amounts to imminent and substantial endangerment to the public health or safety, or to the environment. (§ 2774.1, subd. (f)(1).) Similarly, the Director may take actions to seek forfeiture of financial assurances where the lead agency has failed to act or has been unsuccessful. (§ 2773.1, subd. (d).)
Where the lead agency fails to fulfill its duties under SMARA, the Board may take over the powers of a lead agency, except for permitting authority. The Board may step in if it finds that a lead agency has: (1) approved reclamation plans and financial assurances that are not consistent with SMARA; (2) failed to inspect mines as required by SMARA; (3) failed to seek forfeiture of financial assurances to carry out reclamation; (4) failed to take appropriate enforcement actions; (5) intentionally misrepresented the results of inspections; or (6) failed to submit the required information to the Department. (§ 2774.4, subd. (a).) The Board may take over as lead agency where the lead agency fails to submit a copy of the mining permit for every surface mining operation within its jurisdiction by July 1, 1991, or fails to submit amendments to the permit or reclamation plans for such mines by July 1 of each subsequent year. (§ 2774, subd. (e).)
SMARA contains three specific provisions for petitioning for a writ of mandate. Any person may petition for a writ of mandate to compel the Board, the state geologist,[2] or the Director to carry out any *791 duty imposed on them by SMARA. (§ 2716.) An operator may petition for a writ of mandate to review any administrative penalties imposed. (§ 2774.2, subd. (e).) A lead agency, an operator, or an interested party may obtain writ review of the Board's action in taking over as lead agency. (§ 2774.4, subd. (f).) There is no similar provision for petitioning for a writ of mandate against a lead agency.
Further, SMARA expressly provides its remedies against a mine operator are not exclusive; remedies under section 2774.1 "are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal." (§ 2774.1, subd. (g).) There is no similar reservation of rights in section 2774.4, concerning a lead agency's deficiencies in implementing and enforcing SMARA.
The Director's role under SMARA is primarily advisory; the Director advises lead agencies as to the adequacy of proposed reclamation plans and financial assurances. (§ 2774, subd. (c).) Significantly, while the lead agency must respond to the Director's comments, it need not follow them. (§ 2774, subd. (d)(2).) The Director also has a backup role in enforcing SMARA against mine operators. If the lead agency fails to take action, or the danger is imminent, the Director may initiate enforcement action. (§ 2774.1, subd. (f).)
When it comes to enforcing SMARA against a recalcitrant lead agency, SMARA gives that role to the Board. The Board reviews the lead agency's ordinances pertaining to reclamation plans and financial assurances for compliance with SMARA. (§§ 2774.3, 2774.5.) Any reclamation plans that have been approved under an ordinance the Board has not certified to comply with SMARA, may be amended by the Board. (§ 2774.5, subd. (c).) The Board has the power to take over the powers of a lead agency, except permitting authority, if the lead agency fails to fulfill its obligations under SMARA. (§ 2774.4.) Finally, while SMARA authorizes seeking a writ to compel the Board or the Director to carry out their duties (§ 2716), there is no similar provision for directing a writ of mandate against the lead agency.[3]
If, as the Director contends, the County had approved reclamation plans and financial assurances for Weber Creek Quarry and Diamond Quarry that did not comply with SMARA, the Board could take two different actions. First, the Board did not certify the County's ordinance until November 13, 1998. Since there was no certified ordinance in effect when the reclamation plans and assurances were approved, the Board could have amended them. (§ 2774.5, subd. (c).) Second, the Board could have taken over the lead agency powers for the County. (§ 2774.4, subd. (a)(1).) Later, on June 14, 2001, the Board exercised this power.
*792 SMARA, especially after the 1990 amendments, reflects the Legislature's delicate balancing between home rule, which permits local elected officials to make land use decisions, and effective and consistent statewide enforcement of SMARA. The Legislature accomplished this balance by circumscribing the specific roles of each entity involved, the Director, the Board, and the lead agency. In deference to the legislative scheme, we conclude the Director's limited role under SMARA, especially when compared to the Board's role in overseeing lead agencies, establishes that SMARA does not give the Director standing to petition for a writ for judicial review of a lead agency's actions in approving reclamation plans and financial assurances that do not comply with SMARA.
The Director contends he must have standing to adequately protect the public's interest under SMARA. The Director argues the Board cannot provide the necessary level of protection for three reasons. First, the Board does not review all reclamation plans as the Director does, so the Board would not be on notice of when inadequate plans are being approved. Second, the Board must conduct its business under the open meeting laws of Government Code sections 11120-11132 and therefore cannot act quickly. This limitation is significant in light of the short statute of limitations under CEQA. Third, the Director has an expert staff and so is in a better position than the Board to determine when a judicial challenge is appropriate.
These arguments attack the efficacy of the statutory scheme the Legislature enacted in SMARA. It is well established that it is not our province to assess the wisdom of legislation. (Superior Court v. County of Mendocino (1996) 13 Cal.4th 45, 53, 51 Cal.Rptr.2d 837, 913 P.2d 1046.) Moreover, nothing in SMARA prevents the Director from raising his concerns about a lead agency's actions in approving reclamation plans to the Board, even before the allegedly deficient plans are approved, and offering the Department's expert advice.
The Director argues the statutory provision for his comments to proposed reclamation plans must have a purpose. He posits the purpose is to provide a record of both the lead agency's and the Department's reasoning on contested issues for judicial review. He protests that without judicial review of a lead agency's actions, the lead agency could ignore the requirement to respond to the Director's comments.
None of these arguments provide a persuasive reason to find standing where none appears in the language of SMARA. The Department's comments on proposed reclamation plans serve a valuable purpose aside from any role in future litigation. A report on SMARA prepared for the Legislature and the Governor under former section 2774.6 (Stats. 1990, ch. 1097, § 17, pp. 4591-4592) states the Office of Mining Reclamation within the Department "views the comments as an important element of their training and consulting mission: lead agencies learn how to require better reclamation plans in the future from the current plan's comments." As for the lead agency's refusal to follow its obligations under SMARA, that can be grounds for the Board taking over as lead agency. (§ 2774.4, subd. (a).)
The Director contends the comment process in SMARA is analogous to that in CEQA and supports finding he has standing. "Just as any commentator may sue to challenge a CEQA lead agency's disregard of comments, so should the power of the Director to sue under SMARA for judicial review be recognized." As the Director *793 recognizes, CEQA is a different statutory scheme. SMARA expressly provides for the Board to take action when the lead agency fails in its responsibilities.
The Director contends that even apart from SMARA the Legislature has given him express authority to bring a lawsuit such as this one. He relies on Government Code section 945, which provides that a public entity may sue and be sued, and more specifically, on Government Code section 11180. Government Code section 11180 reads: "The head of each department may make investigations and prosecute actions concerning: [¶] (a) All matters relating to the business activities and subjects under the jurisdiction of the department, [¶] (b) Violations of any law or rule or order of the department. [¶] (c) Such other matters as may be provided by law."
Relying on Fielder v. Berkeley Properties Co. (1972) 23 Cal.App.3d 30, 99 Cal. Rptr. 791, the County retorts that Government Code section 11180 does not apply to judicial proceedings. This position is an incorrect reading of the law. The proceeding at issue in Fielder was an administrative investigation. The court held that since the proceedings were investigative rather than judicial, the subpoenas issued by the Director of Agriculture need not comply with the requirements of the Code of Civil Procedure. (Id. at p. 38, 99 Cal. Rptr. 791.) Government Code section 11180 has been cited in cases in which the director of a department brought a lawsuit. (Westly v. Board of Administration (2003) 105 Cal.App.4th 1095, 1105, 130 Cal. Rptr.2d 149; People ex rel. Dept. of Conservation v. Triplett (1996) 48 Cal.App.4th 233, 253, 55 Cal.Rptr.2d 610; Tieberg v. Superior Court (1966) 243 Cal.App.2d 277, 282-283, 52 Cal.Rptr. 33.)
While we agree with the Director that Government Code section 11180 applies to a judicial action, we disagree that it gives the Director standing. In our view, Government Code section 11180 only authorizes the Director to sue, it does not confer standing. "`There is a difference between the capacity to sue, which is the right to come into court, and the standing to sue, which is the right to relief in court.' [Citation.]" (Color-Vue, Inc. v. Abrams (1996) 44 Cal.App.4th 1599, 1604, 52 Cal.Rptr.2d 443, original italics.) The cases that cite Government Code section 11180 in the judicial context do not rely on it exclusively to confer standing, but also address the director's beneficial interest. In Tieberg v. Superior Court, supra, 243 Cal.App.2d 277, 52 Cal.Rptr. 33, the director of the Department of Employment sought a writ to review a decision of the Unemployment Insurance Appeals Board that certain television writers were independent contractors and therefore their employer had no liability for an unemployment assessment. The trial court found the director had no standing. On appeal, the court noted there was no express statutory authority for the director to seek judicial review, but the absence of such a provision did not preclude such review. (Tieberg v. Superior Court, supra, 243 Cal.App.2d at p. 282, 52 Cal.Rptr. 33.) Citing Government Code section 11180, the court found the director had standing because he was allowed by statute to appear at the hearing and, as administrator of the unemployment insurance fund, he was beneficially interested in the decision of the appeals board. (Id. at pp. 282-283, 52 Cal.Rptr. 33.) The court concluded the power to seek review of the appeals board's action was necessarily implied or incident to the powers expressly granted and indispensable to fulfill the purposes of the unemployment insurance act. (Id. at p. 284, 52 Cal.Rptr. 33.)
*794 Although the Tieberg court cited to Government Code section 11180, it did not rely exclusively on that statute to find standing. (243 Cal.App.2d 277, 52 Cal.Rptr. 33.) Rather, it found the director of the Department of Employment was beneficially interested because he had a pecuniary interest as administrator of the unemployment insurance fund and he was statutorily entitled to appear at the hearing. Moreover, implied authority to challenge the ruling of the Unemployment Insurance Appeals Board was indispensable to fulfill the purposes of the act.
In People ex rel. Dept. of Conservation v. Triplett, supra, 48 Cal.App.4th 233, 254, 55 Cal.Rptr.2d 610, the Director had standing because the Department of Conservation was charged with enforcing the Williamson Act and had a significant pecuniary interest as it received the cancellation fee at issue. In Westly v. Board of Administration, supra, 105 Cal.App.4th 1095, 1107, 130 Cal.Rptr.2d 149, the Controller had standing to enforce his authority to audit the disbursement of state money for its legality and correctness.
Here, the Director has no similar beneficial interest to give him standing. While SMARA grants the Director backup authority to enforce SMARA against mine operators, it assigns oversight of lead agencies to the Board, as detailed above. It is the Board that reviews the lead agency's ordinance to ensure compliance with state policy and communicates any deficiencies in the ordinance to the lead agency. (§§ 2774.3, 2774.5.) It is the Board that may take over review of reclamation plans from a lead agency. (§ 2774.5, subd.(a).) It is the Board that reviews reclamation plans if the lead agency has not yet adopted an ordinance. (§ 2774.5, subd. (c).) It is the Board that may amend a reclamation plan approved by a lead agency if the ordinance does not comply with state policy. (Ibid.) Thus, allowing the Director to petition for a writ to review the actions of a lead agency in approving a reclamation plan and financial assurances upsets the carefully crafted statutory scheme of SMARA that grants oversight of lead agencies to the Board, while preserving home rule that allocates decisionmaking authority for land use issues to local elected officials.
Finally, the Director suggests that since he appeared in the hearing before the planning commission on the reclamation plans and financial assurances for Weber Creek Quarry and Diamond Quarry and appealed the commission's decision to the board of supervisors, he has standing to petition for a writ.
"It is settled law in California that if a person is permitted by statute to appear and take part in an administrative hearing, he is sufficiently beneficially interested to seek a writ of mandate to review the administrative decision or disposition. [Citations.]" (Memorial Hosp. of So. Cal. v. State Health Planning Council (1972) 28 Cal.App.3d 167, 178, 104 Cal.Rptr. 492, italics added.) "We are aware of no authority which holds that a person permitted by statute to participate as an interested party in the administrative hearings and to take appeals at the administrative level is, nevertheless, without a sufficient interest in the result to test the legality of the final decision before a court of law. Indeed, it seems to us that elemental principles of justice require that parties to the administrative proceeding be permitted to retain their status as such throughout the final judicial review by a court of law, for the fundamental issues in litigation remain essentially the same. [Citation.]" (Bodinson Mfg. Co. v. California E. Com. (1941) 17 Cal.2d 321, 330, 109 P.2d 935, italics added.)
*795 The rule that a party to an administrative hearing may challenge the resulting administrative decision applies where the party has a statutory right to appear at the hearing. (Bodinson, supra, 17 Cal.2d at p. 330, 109 P.2d 935; Memorial Hosp. of So. Cal, supra, 28 Cal.App.3d 167, 178, 104 Cal.Rptr. 492.) The Director identifies no statute that gave him the right to appear before the planning commission or board of supervisors. That the Director was allowed to appear does not confer standing upon him. (Madruga v. Borden Co. (1944) 63 Cal.App.2d 116, 121-122, 146 P.2d 273 [on judgment roll appeal, court had to accept finding that petitioners were not aggrieved and had no standing even though petitioners had appeared at administrative hearing].)
The Director does not have a beneficial interest sufficient to give him standing to petition for a writ of administrative mandamus. We base this conclusion on the language of SMARA and the precise allocation of the roles of the lead agency, the Board and the Director. SMARA gives the Board, not the Director, the role of oversight over lead agencies. In light of this statutory scheme, there are additional policy considerations that militate against permitting this lawsuit.
In Carsten v. Psychology Examining Com., supra, 27 Cal.3d 793, 166 Cal.Rptr. 844, 614 P.2d 276, the Supreme Court held a member of an administrative board did not have standing to sue the board. First, the court held since petitioner was not seeking or in danger of losing a psychology license, she had no beneficial interest. (Id. at p. 797, 166 Cal.Rptr. 844, 614 P.2d 276.) The court then considered whether the board member could come under the citizen-taxpayer exception.[4] The court found several policy issues militated against allowing a disgruntled governmental agency member to seek extraordinary writs. "Unquestionably the ready availability of court litigation will be disruptive to the administrative process and antithetical to its underlying purpose of providing expeditious disposition of problems in a specialized field without recourse to the judiciary." (Id. at p. 799, 166 Cal.Rptr. 844, 614 P.2d 276.) Defense of such suits would severely tax the limited resources of the public agency. (Ibid.) And the suit would be duplicative, "a rerun of the administrative proceedings in a second, more formal forum." (Ibid.)
In Personnel Com. v. Barstow Unified School Dist. (1996) 43 Cal.App.4th 871, 50 Cal.Rptr.2d 797, the court found the policy considerations articulated in Carsten argued against allowing a personnel commission to sue the school district. There was the potential for disruption, as decisions the Legislature intended to be made by school district governing boards would instead be subject to judicial review at the instance of the commission. (Id. at p. 883, 50 Cal.Rptr.2d 797.) The court proceedings would be a rerun of the administrative proceedings and taxpayers would have to pay for the internal dispute. (Ibid.)
The same analysis holds true here, especially the potential for disruption. Not only would decisions that the Legislature intended to be made by local agencies, with Board oversight, be subject to judicial review, but the Director could be seen as infringing on the Board's authority and as a potential adversary rather than advisor to lead agencies. In addition, the technical nature of the issue here calls for resolution by the Board, with the expert background and experience of its members, rather than a court. SMARA provides that the *796 Board should step in when a lead agency is approving reclamation plans that do not comply with SMARA. The Director seeks judicial review of that question. His brief on the merits of the SMARA claim is 82 pages long; much of it attacks the soundness of the geology behind Brunius's slope stability analysis for reclamation of Weber Creek Quarry. That is a question for the Board, not a trial court.
The trial court did not err in dismissing the case on the grounds that the Director lacked standing to pursue the SMARA claims.

II. Standing to Challenge Vested Use
Subsequent to the approval of the reclamation plan and financial assurances for Weber Creek Quarry, the County found Weber Creek Quarry was a vested nonconforming use and therefore did not require a permit. The Director contends that due to his responsibilities under SMARA, he has standing to challenge that determination. He contends the determination directly effects his ability to enforce SMARA against mine operators. If a mining operation is found to be a vested use, no reclamation plan is required for operations prior to January 1, 1976. (§ 2776.) The Director argues that improper vesting determinations allow a mining operator to avoid SMARA.
As discussed at length above, the Director's role under SMARA does not give him standing to challenge the actions of a lead agency. This is especially true with respect to the lead agency's powers to regulate land use. Even when the Board has taken over lead agency powers, the lead agency retains its permitting authority. (§ 2774.4, subd. (a).) Further, SMARA expressly provides that it does not limit a county's police power with respect to land use regulation. "No provision of this chapter or any ruling, requirement, or policy of the board is a limitation on any of the following: [¶] (a) On the police power of any city or county or on the power of any city or county to declare, prohibit, and abate nuisances. [¶] ... [¶] (f) On the power of any city or county to regulate the use of buildings, structures, and land as between industry, business, residences, open space (including agriculture, recreation, the enjoyment of scenic beauty, and the use of natural resources), and other purposes." (§ 2715.)
Since the Director had no standing to challenge the County's action with respect to finding Weber Creek Quarry was a vested nonconforming use, the trial court did not err in granting summary adjudication of this cause of action.

III. Standing to Assert CEQA Claims
The Director contends he had standing to assert CEQA claims because he had authority to comment on the CEQA documents as an agency with special expertise. (Cal.Code Regs., tit. 14, § 15209.) He further asserts adequate CEQA review was essential to carry out his responsibilities under SMARA. Although not a lead agency, responsible agency, or trustee agency under CEQA, he contends his duties under SMARA make his standing patent.[5]
The Director contends his beneficial interest is analogous to that of other public *797 agencies found to have standing to assert CEQA claims. In Santiago County Water Dist. v. County of Orange (1981) 118 Cal. App.3d 818, 173 Cal.Rptr. 602, the county asserted the water district was not a responsible agency and so lacked standing to sue. The court found it unnecessary to determine if the water agency was a responsible agency as it was a "`party beneficially interested'" under Code of Civil Procedure section 1086. The water district was the agency that would provide water to the proposed project and thus had a special interest in ensuring the EIR fully and adequately addressed the delivery of water to the project. (Id. at p. 832, 173 Cal.Rptr. 602.) The water district's authority under Water Code section 31020 to "`do any act necessary to furnish sufficient water'" gave it standing. (Id. at p. 833, 173 Cal.Rptr. 602.) Moreover, the water district was in the best position to evaluate the adequacy of the EIR as to the environmental effects of providing water to the project. (Ibid.)
In Murrieta Valley Unified School Dist. v. County of Riverside (1991) 228 Cal. App.3d 1212, 279 Cal.Rptr. 421, a school district challenged a general plan amendment. One of the challenges was that the amendment violated CEQA by failing to address the significant adverse impact of the district's ability to provide school facilities due to overcrowding. The court found the school district had standing. "Surely, District has a special interest in making sure that the EIR complies with the requirements of CEQA and the statutory adequacy and consistency requirements of the Government Code related to general plans, so as to assure it that the impact of the approval of the [amendment] on the conditions of overcrowding and inadequate school facilities were considered, that feasible mitigation measures were provided in the [amendment], or that reasonable available alternatives were employed to avoid or lessen the impact." (Id. at p. 1224, 279 Cal.Rptr. 421.)
In both of these cases the public agency had standing to raise CEQA claims because the proposed project would overburden resources administered by the agency. That is not the case here. The Director's role under SMARA is to advise lead agencies as to the adequacy of reclamation plans and financial assurances and to serve as backup enforcement against mining operators. The Director contends he needs adequate CEQA review to ensure that the reclamation plans comply with SMARA. As discussed above, if he believes the lead agency is approving reclamation plans that do not comply with SMARA, his remedy is to take his concerns to the Board, not to petition for a writ of mandate.
The trial court did not err in dismissing the CEQA claims.

IV. Attorney Fees
After the trial court dismissed the petition, it awarded attorney fees of over $500,000 to the County, Brunius, and Interveners under Code of Civil Procedure section 1021.5, the private attorney general doctrine (hereafter section 1021.5). The Director contends none of the prevailing parties is entitled to attorney fees because they did not achieve an important public benefit and they litigated to protect their own particular economic and political interests.
Section 1021.5 permits a court to award attorney fees to a successful party against one or more opposing parties "in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred upon the general public or a large class of persons, (b) the *798 necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[6]
"[T]he fundamental objective of the private attorney general doctrine of attorney fees is `"to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees ... to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens."` [Citation.] The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]" (Woodland Hills Residents Assn., Inc. v. City Council (1979) 23 Cal.3d 917, 933, 154 Cal.Rptr. 503, 593 P.2d 200 (Woodland Hills).)
There are three basic factors to be considered in awarding attorney fees under section 1021.5. "`These are in general: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [and] (3) the number of people standing to benefit from the decision. [Citation.]' [Citation.]" (Woodland Hills, supra, 23 Cal.3d at pp. 933-934, 154 Cal.Rptr. 503, 593 P.2d 200.)
Attorney fees may be awarded to a defendant who is forced to litigate an action to enforce an important right affecting a public interest. (Woodland Hills Homeowners Organization v. Los Angeles Community College Dist. (1990) 218 Cal. App.3d 79, 96, 266 Cal.Rptr. 767.) Interveners may be entitled to attorney fees where they make a clear showing of some unique contribution to the litigation. (Crawford v. Board of Education (1988) 200 Cal.App.3d 1397, 1407, 246 Cal.Rptr. 806.)
Section 1021.5 provides no concrete standard or test for determining whether the right vindicated is sufficiently important to justify attorney fees. (Woodland Hills, supra, 23 Cal.3d at p. 935, 154 Cal.Rptr. 503, 593 P.2d 200.) While the private attorney general doctrine applies to statutory as well as constitutional rights, there must be some selectivity on a qualitative basis; section 1021.5 applies only to "important" rights and courts must exercise judgment in ascertaining the strength or societal importance of the right at issue. (Ibid.) In determining the importance of the right, courts "should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." (Id. at p. 936, 154 Cal. Rptr. 503, 593 P.2d 200.)
The Director contends that determining whether he has standing to bring this suit is not an important right affecting the public interest. The trial court did not rule on the merits of the SMARA claims and did not rule there was no judicial review of lead agency action. Indeed, the trial court suggested the Board could petition for a writ of mandate, an issue we need not decide. Finally, the Director contends this suit has no public benefit as *799 it will make SMARA enforcement more cumbersome.
Brunius argues that since the Director sought attorney fees in his suit, he should be estopped from arguing the successful defense of the action does not merit attorney fees. The County asserts that enforcing the statutory scope of the Director's power is an important right that will have an impact on every county and 1,400 mines in California. Interveners contend their defense enforced the important right of lead agencies to implement SMARA free of unauthorized legal challenges by the Department. The overriding principle of the litigation is that state agencies must follow the law.
"The decision whether the claimant has met his burden of proving each of these prerequisites and is thus entitled to an award of attorney fees under section 1021.5 rests within the sound discretion of the trial court and that discretion shall not be disturbed on appeal absent a clear abuse. [Citations.]" (Ryan v. California Interscholastic Federation (2001) 94 Cal.App.4th 1033, 1044, 114 Cal. Rptr.2d 787.) Although the decision whether to award private attorney general fees lies initially with the trial court, several courts have held that where the litigation results in an appellate opinion, the appellate court is equally well positioned to determine if the decision vindicated an important right in the public interest. (Schmier v. Supreme Court (2002) 96 Cal. App.4th 873, 880, 117 Cal.Rptr.2d 497; Leiserson v. City of San Diego (1988) 202 Cal.App.3d 725, 737, 249 Cal.Rptr. 28; Bouvia v. County of Los Angeles (1987) 195 Cal.App.3d 1075, 1083, fn. 7, 241 Cal. Rptr. 239.) "It is in the true sense a question of law. It makes little sense to defer to the discretion of a single trial judge who may have had to make this decision in a matter of moments on the basis of a rather cursory review of the legal field involved when the deferring body would be three judges who have already researched the legal aspects of the case in depth in order to produce a full-fledged appellate opinion on the subject." (Los Angeles Police Protective League v. City of Los Angeles (1986) 188 Cal.App.3d 1, 8-9, 232 Cal.Rptr. 697.) We find this lawsuit did not effectuate a strong public policy; accordingly, the trial court abused its discretion in awarding fees under section 1021.5.
We reject outright Brunius's contention that fees are appropriate because the Director sought attorney fees in his complaint. Section 1021.5 does not contain a reciprocity provision. Instead, entitlement to attorney fees is determined by applying the statutory criteria.
The first criterion, that the action "resulted in the enforcement of an important right affecting the public interest," is not met here. This opinion interprets SMARA and finds that the Director's role under SMARA is limited and does not include initiating judicial review of lead agency action. The "right" of lead agencies to be free of unauthorized interference from the Director does not bear a close relationship to the achievement of the fundamental goals of SMARA. (Woodland Hills, supra, 23 Cal.3d at p. 936, 154 Cal. Rptr. 503, 593 P.2d 200.) The purpose of SMARA is to establish an effective surface mining and reclamation policy that encourages production and conservation of minerals while preventing or minimizing adverse environmental effects. (§ 2712.) Determining that the Director lacked standing does not vindicate or enforce the public policy of SMARA; it simply defines the roles of the various entities under the statutory scheme. We have not decided that lead agencies have unfettered discretion in implementing SMARA without any oversight from the state. Rather, we conclude simply that the Board, not the Director, is *800 the state entity designated to provide that oversight. The Board retains its important oversight role.
Of course, as Interveners assert, this decision does require the Director to follow the provisions of SMARA. In that sense it enforces the important right of requiring state agencies to follow the law, but virtually all lawsuits can be said to effectuate a strong public policy by enforcing the rule of law. An award of attorney fees under section 1021.5, however, requires qualitative selectivity in determining "important" rights; not all statutory rights are eligible. (Woodland Hills, supra, 23 Cal.3d at p. 936, 154 Cal.Rptr. 503, 593 P.2d 200.)
That we have certified this case for publication does not establish that it vindicates an important right. While publication of an appellate opinion is probative on the question, publication status is not determinative. (Leiserson v. City of San Diego, supra, 202 Cal.App.3d 725, 737, 249 Cal.Rptr. 28; Los Angeles Police Protective League v. City of Los Angeles, supra, 188 Cal.App.3d at p. 12, 232 Cal.Rptr. 697.) Just as not every enforcement of a statutory right is entitled to an award of attorney fees under section 1021.5, not every published opinion vindicates a right that is "important" enough to meet the criteria of section 1021.5.
The policy behind section 1021.5 is "rewarding the effectuation of significant policy...." (Serrano v. Priest (1977) 20 Cal.3d 25, 45, fn. 16, 141 Cal.Rptr. 315, 569 P.2d 1303.) Dismissal of this proceeding because the Director lacked standing did not effectuate a significant public policy. In exercising discretion to award fees under section 1021.5, the trial court is bound by the legal principles governing such an award. (City of Sacramento v. Drew (1989) 207 Cal.App.3d 1287, 1297.) Section 1021.5 requires the enforcement of an important right affecting the public interest as a prerequisite to an award. Because that prerequisite is absent here, the trial court abused its discretion in awarding fees. This lawsuit did not result "in the enforcement of an important right affecting the public interest" (§ 1021.5), so the award of attorneys fees must be reversed.
Our dissenting colleague contends that our decision means that no one will ever be able to remedy a violation of SMARA. That is simply not so. First, we are confident that most lead agencies will work cooperatively with the Director, the Board, and mine operators to ensure reclamation plans and financial assurances comply with SMARA. In cases where the lead agency fails to do so, nothing in our decision prevents the Board from seeking a writ of mandate to set aside lead agency decisions that violate SMARA. Further, a private action to enforce SMARAwhether in favor of the mine operator or the environmentmay well qualify for attorney fees under section 1021.5 if the action enforces an important right affecting the public interest. Here, respondents' legal victory did not effectuate the policy of SMARA; rather, it was only a procedural victory on the issue of standing. It was for this reason and not to discourage environmental litigation that we deny them attorney fees under section 1021.5.

DISPOSITION
The judgment of dismissal is affirmed. The order awarding the County, Brunius, and Interveners attorney fees is reversed. The parties shall bear their own costs on appeal.
I concur: SCOTLAND, P.J.
*801 SIMS, J.
I respectfully dissent from the majority opinion, which concludes the Director of the Department of Conservation (Director) has no standing to challenge, by way of writ of mandate, a lead agency's various actions in approving reclamation plans and financial assurances for surface mining operations under the Surface Mining and Reclamations Act of 1975 (Pub. Resources Code, § 2710 et seq. (SMARA)).
In my view, the Director is authorized to bring such an action by Government Code section 11180 (section 11180), which reads in pertinent part:
"The head of each department may make investigations and prosecute actions concerning:
"(a) All matters relating to the business activities and subjects under the jurisdiction of the department."
As pertinent, section 11180 authorizes the head of a department (and there is no dispute that the Director is such a head) to "prosecute actions concerning ... [¶] ... [¶]
"All matters relating to the business activities and subjects under the jurisdiction of the department." (Emphasis added.) "`Related' is a commonly used word with a broad meaning that encompasses a myriad of relationships. For example, a leading legal dictionary defines `related' to mean `standing in relation; connected; allied; akin.' (Black's Law Dict. (6th ed.1990) p. 1288, col. 1.) Similarly, a legal thesaurus lists many synonyms for `related.' (Burton, Legal Thesaurus (1980) p. 925, col.2.) ...[¶] ... [¶]
"`[R]elated' is broad enough to encompass ... logical as well as causal relationships." (Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 868, 21 Cal.Rptr.2d 691, 855 P.2d 1263 [construing "related" in insurance policy].) "`"Related" is a generous choice of wording, suggesting that interpretation should favor inclusion rather than exclusion....'" (Williams v. MacFrugal's Bargains-Close-Outs, Inc. (1998) 67 Cal.App.4th 479, 482, 79 Cal. Rptr.2d 98.)
The writs of mandate sought here are "related to" the business activities and subjects under the jurisdiction of the Department of Conservation because the Department has responsibility for promulgating statewide reclamation standards and for enforcing reclamation plans (Pub. Resources Code, §§ 2770, subd. (g), 2773, 2773.1, 2774.1, 2774.5) and the purpose of the Director's administrative mandate actions is to see to it that state regulations applicable to reclamation plans are enforced. (See Pub. Resources Code, § 2773.) Consequently, the Director has standing to bring this action under section 11180.
Nothing in SMARA, either directly or indirectly, limits the Director's authority under section 11180.
Thus, as the majority opinion points out at page 790, SMARA contains three specific provisions for petitioning for a writ of mandate, none of which remotely applies to the circumstances here. In particular, SMARA does not authorize the State Mining and Geology Board (Board) to bring a petition for writ of mandate, as the majority opinion points out at page 790. Consequently, SMARA may not be read as explicitly or implicitly placing exclusive authority to bring a writ of mandate in the Board and not the Director. Nor does this record contain any evidence of disapproval of the Director's lawsuits by the Board.
Moreover, Public Resources Code section 2774.1, which authorizes the Director to bring enforcement actions, expressly provides, "(g) Remedies under this section are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal." The instant petitions for writ of mandate are "other remedies," civil in nature.
*802 Finally, SMARA must be read in light of the established rule of statutory construction that, "The Legislature is deemed to be aware of existing laws ... in effect at the time legislation is enacted...." (Viking Pools, Inc. v. Moloney (1989) 48 Cal.3d 602, 609, 257 Cal.Rptr. 320, 770 P.2d 732.) Thus, we presume the Legislature was aware of the general grant of prosecutorial authority to the Director in section 11180 when it enacted SMARA. Rather than limit or abrogate the Director's authority under section 11180, SMARA implicitly endorses it, as another civil remedy, in Public Resources Code section 2774.1, subdivision (g).
In short, I find nothing in SMARA abrogating the general authority of the Director to bring actions pursuant to section 11180.
The California Supreme Court has held that the investigatory powers contained in section 11180 should be liberally construed. (Shively v. Stewart (1966) 65 Cal.2d 475, 479, 55 Cal.Rptr. 217, 421 P.2d 65.) I would adopt the same rule with respect to the powers to prosecute an action. It is in the public interest for a director of a state department to see to it that laws, enacted by the Legislature, are enforced. That is the purpose of section 11180, and its prosecutorial powers should be given a liberal construction, just as its investigatory powers are given a liberal construction. In this case, the Director seeks to enforce state regulations promulgated by the Board pursuant to its authority in Public Resources Code section 2773. This is precisely the sort of thing section 11180 is aimed at.
I have read all authorities interpreting section 11180. All the cases that have construed section 11180, except two, have involved the statute's grant of investigatory powers. This is true of the single authority cited by Real Party in Interest, BruniusFielder v. Berkeley Properties Co. (1972) 23 Cal.App.3d 30, 99 Cal.Rptr. 791which the majority properly reject. The two cases that have construed the authority of a department head to prosecute an action, under section 11180, have both concluded that the department head has standing to do so. (See People ex rel. Dept. of Conservation v. Triplett (1996) 48 Cal.App.4th 233, 253, 55 Cal.Rptr.2d 610; Tieberg v. Superior Court (1966) 243 Cal. App.2d 277, 283, 52 Cal.Rptr. 33.) I am aware of no authority, including opinions of the Attorney General (which I have read), holding that a department head does not have authority to prosecute an action under section 11180. The majority's position in this case is therefore unique.
On page 794, the majority opinion purports to distinguish Tieberg on the ground that, in that case, the department head had a pecuniary interest whereas, in this case, he does not. In my view, this distinction is not persuasive. Surely, a department head need not have a pecuniary interest in order to have standing to bring an action under section 11180. Rather, the question should be whether the terms of the statute have been complied with, i.e., whether the department head is bringing an action that is "relating to" the business or subjects under the jurisdiction of the department. This is the way section 11180 confers standing on a department headif the department head is bringing an action "relating to" the business of the department, the statute confers standing on the department head. In this case, the director surely is bringing actions "relating to" the business of the Department of Conservation.
This brings me to the reasons advanced for rejecting section 11180 as the basis for the Director's standing to bring the actions at issue here.
*803 The County, which does not cite section 11180 in its brief, advances no reason at all.
As noted, Real Party in Interest Brunius relies on Fielder v. Berkeley Properties, Co., supra, 23 Cal.App.3d 30, 99 Cal.Rptr. 791, for the proposition that section 11180 is limited to administrative proceedings and does not authorize a department head to prosecute judicial proceedings in court. This argument is correctly dispatched by the majority opinion on page 793.
Interveners California Mining Association, et al. assert that section 11180 "seems closer to the [standing] mark at first glance, but that statute says nothing about standing or `beneficial interest.'" This is the argument apparently relied on by the majority, whose opinion rests on a purported distinction between "`the right to come into court and the standing to sue, which is the right to relief in court.' [Citation.]" (Color-Vue, Inc. v. Abrams (1996) 44 Cal.App.4th 1599, 1604, 52 Cal.Rptr.2d 443.)
The argument overlooks the crucial fact that the "beneficial interest" requirement in a mandate proceeding is relaxed when the question is one of public right and the object is to procure the enforcement of a public duty. (Hollman v. Warren (1948) 32 Cal.2d 351, 357, 196 P.2d 562; McDonald v. Stockton Met. Transit Dist. (1973) 36 Cal.App.3d 436, 440, 111 Cal. Rptr. 637.) In that circumstance the petitioner need show no greater personal interest than that of a citizen or taxpayer who wants the law enforced. (Ibid.) Accordingly, it is consistently held that a public official charged with responsibility in the administration or enforcement of a law has a sufficient interest to establish standing in a mandate action. (Brown v. Superior Court (1971) 5 Cal.3d 509, 514, 96 Cal.Rptr. 584, 487 P.2d 1224; People ex rel. Younger v. County of El Dorado (1971) 5 Cal.3d 480, 491-492, 96 Cal.Rptr. 553, 487 P.2d 1193; State Board of Pharmacy v. Superior Court (1978) 78 Cal.App.3d 641, 645-646, 144 Cal.Rptr. 320.) In this case, as I have said, section 11180 itself confers standing on the Director.
The majority argue that, "SMARA, especially after the 1990 amendments, reflects the Legislature's delicate balancing between home rule, which permits local elected officials to make land use decisions, and effective and consistent statewide enforcement of SMARA. The Legislature accomplished this balance by circumscribing the specific roles of each entity involved, the Director, the Board, and the lead agency. In deference to the legislative scheme, we conclude the Director's limited role under SMARA, especially when compared to the Board's role in overseeing lead agencies, establishes that SMARA does not give the Director standing to petition for a writ for judicial review of a lead agency's actions in approving reclamation plans and financial assurances that do not comply with SMARA."
This argument fails because it fails to account for the power granted the Director by section 11180. As I have noted, no language in SMARA abrogates the Director's section 11180 prosecutorial powers. As this court has properly noted, "As was said long ago, and often repeated, `"[i]t is elementary that there can be no intent in a statute not expressed in its words; that the intention of the Legislature must be determined from the language of the statute...." (Seaboard Acceptance Corp. v. Shay (1931) 214 Cal. 361, 365, 5 P.2d 882 [...].)' (In re Goddard (1937) 24 Cal.App.2d 132, 139, 74 P.2d 818.)" (In-Home Supportive Services v. Workers' Comp. Appeals Bd. (1984) 152 Cal.App.3d 720, 739, 199 Cal.Rptr. 697.)
For all these reasons then, I conclude the Director has standing to bring the actions at issue here. I respectfully disagree with my colleagues' conclusion to the contrary.
I also have some thoughts on the question of entitlement of the various parties to attorneys' fees under the "private Attorney *804 General" statute, Code of Civil Procedure section 1021.5 (section 1021.5).
Section 1021.5 (with 1993 amendment in italics) provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Stats. 1993, ch. 645 (S.B. 764), § 2, p. 3747.)
I would not award fees because I would not have the County, Brunius, or Interveners prevail. Section 1021.5 authorizes a fee award only to "a successful party," which is synonymous with "prevailing party." (Schmier v. Supreme Court (2002) 96 Cal.App.4th 873, 877, 117 Cal.Rptr.2d 497.) In my view, the respondents should not prevail and be successful at this juncture.
But if they were to prevail, as they have by virtue of the majority opinion, I would uphold the trial court's award of fees.
This court has recognized that the award of fees by a trial court is a matter entrusted to the discretion of the trial court and is reviewed by this court for abuse of discretion. (Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors (2000) 79 Cal. App.4th 505, 511-512, 94 Cal.Rptr.2d 205; see Schmier v. Supreme Court, supra, 96 Cal.App.4th 873, 877, 117 Cal.Rptr.2d 497, and authorities cited.) If respondents were to prevail, there would be no abuse of the trial court's discretion in this case.
The 1993 amendment of section 1021.5 (see p. 804, ante) makes clear that fees may be awarded to a public entity. Moreover, it is settled that section 1021.5 fees may be awarded to a defendant who is the successful party. (County of San Luis Obispo v. Abalone Alliance (1986) 178 Cal. App.3d 848, 869, 223 Cal.Rptr. 846.)
The majority deny fees on the ground that the litigation has not upheld an important right affecting the public interest. With respect, I find this conclusion astoundingly wrong. By obtaining the published majority opinion, the various parties who were awarded fees have defined the role of the Director of a statewide department in an opinion with great precedential value.
In truth, the majority opinion simply joins the parade of cases that have nearly emasculated Code of Civil Procedure section 1021.5 over the past 10 years. (Punsly v. Ho (2003) 105 Cal.App.4th 102, 129 Cal.Rptr.2d 89; Caloca v. County of San Diego (2002) 102 Cal.App.4th 433, 447, 126 Cal.Rptr.2d 3; Hammond v. Agran (2002) 99 Cal.App.4th 115, 120 Cal.Rptr.2d 646; Walker v. Countrywide Home Loans, Inc. (2002) 98 Cal.App.4th 1158, 1179-1181, 121 Cal.Rptr.2d 79; Schmier v. Supreme Court, supra, 96 Cal.App.4th 873, 117 Cal. Rptr.2d 497; Ryan v. California Interscholastic Federation (2001) 94 Cal. App.4th 1033, 114 Cal.Rptr.2d 787; Holmes v. California Nat. Guard (2001) 90 Cal.App.4th 297, 323, 109 Cal.Rptr.2d 154; Jobe v. City of Orange (2001) 88 Cal. App.4th 412, 105 Cal.Rptr.2d 782; Bell v. Vista Unified School Dist. (2000) 82 Cal. App.4th 672, 689, 98 Cal.Rptr.2d 263; National Parks & Conservation Assn. v. County of Riverside (2000) 81 Cal.App.4th 234, 96 Cal.Rptr.2d 576; Keller v. Chowchilla Water Dist. (2000) 80 Cal.App.4th 1006, 1010, fn. 4, 96 Cal.Rptr.2d 246; *805 Williams v. San Francisco Bd. of Permit Appeals (1999) 74 Cal.App.4th 961, 88 Cal. Rptr.2d 565; Draeger v. Reed (1999) 69 Cal.App.4th 1511, 1524, 1527, 82 Cal. Rptr.2d 378; United Systems of Arkansas, Inc. v. Stamison (1998) 63 Cal.App.4th 1001, 1012-1013, 74 Cal.Rptr.2d 407; Weeks v. Baker & McKenzie (1998) 63 Cal.App.4th 1128, 1170, 74 Cal.Rptr.2d 510; City of Hawaiian Gardens v. City of Long Beach (1998) 61 Cal.App.4th 1100, 1112-1114, 72 Cal.Rptr.2d 134; Flannery v. California Highway Patrol (1998) 61 Cal. App.4th 629, 71 Cal.Rptr.2d 632; Taylor v. City of Los Angeles (1997) 60 Cal.App.4th 611, 619, 70 Cal.Rptr.2d 521; City of Los Angeles v. Superior Court (1997) 57 Cal. App.4th 1506, 1518, 67 Cal.Rptr.2d 775; Olsen v. Breeze, Inc. (1996) 48 Cal.App.4th 608, 627-629, 55 Cal.Rptr.2d 818; Satrap v. Pacific Gas & Electric Co. (1996) 42 Cal.App.4th 72, 49 Cal.Rptr.2d 348; Pacific Mutual Life Ins. Co. v. State Bd. Equalization (1996) 41 Cal.App.4th 1153, 1165, 49 Cal.Rptr.2d 99; Family Planning Specialists Medical Group Inc. v. Powers (1995) 39 Cal.App.4th 1561, 46 Cal.Rptr.2d 667; California Licensed Foresters Assn. v. State Bd. of Forestry (1994) 30 Cal. App.4th 562, 35 Cal.Rptr.2d 396; Hospital Systems, Inc. v. Office of Statewide Health Etc. Development (1994) 25 Cal.App.4th 1686, 30 Cal.Rptr.2d 922; Ciani v. San Diego Trust & Savings Bank (1994) 25 Cal.App.4th 563, 30 Cal.Rptr.2d 581; Urbaniak v. Newton (1993) 19 Cal.App.4th 1837, 24 Cal.Rptr.2d 333; Planned Parenthood v. City of Santa Maria (1993) 16 Cal.App.4th 685, 691-692, 20 Cal.Rptr.2d 391; Christward Ministry v. County of San Diego (1993) 13 Cal.App.4th 31, 49, 16 Cal.Rptr.2d 435.)
Many of these cases, including this one, are not supportable by the correct application of established rules of law under section 1021.5 but rather represent an unstated policy view that public interest litigation (and particularly environmental litigation) should be discouraged.
In this case, the parties who received fees have obtained an important decision delineating the powers of a statewide official, at great cost to themselves.
If I thought the parties receiving fees should prevail, I would affirm the fee award.
And so, finally, this leaves the question: Who is to enforce the state laws that the Director alleges have been broken?
Not any of the respondents, who have fought the Director at every step.
Not the Director, for he now has no standing.
Not the Board, because even though it has assumed the status of lead agency, it cannot undo what has been done previously, as the Attorney General notes.
And not ordinary citizens, who would incur hundreds of thousands of dollars in attorneys' fees, only to be told at the end that their efforts do not deserve remuneration under section 1021.5.
So, in truth, nobody will remedy the violations of state law at issue in this litigation.
I do not think this can be what the Legislature intended.
NOTES
[*] Sims, J., dissented.
[1] The State's request for judicial notice of this and other documents included in the record on appeal is granted. (Evid.Code, §§ 452, subd. (c); 459.)
[2] Until 1992, the role under SMARA now occupied by the Director was filled by the state geologist. In 1992, the state geologist's role was transferred to the Director. (Stats. 1992, ch. 1077, §§ 6-11, pp. 4998-5006; see also§ 603.1.)
[3] In support of their demurrer, Interveners and the County provided evidence of a proposed amendment that would have permitted the Director or the Attorney General to bring an action to enforce compliance with SMARA. The proposed amendment was not adopted. Interveners and the County argue this legislative history indicated the Legislature considered giving the Director the power to sue lead agencies, but rejected it. The Director disputes that the proposed amendment was ever submitted to the Legislature for consideration. Because we find the limited scope of the Director's role under SMARA is apparent from the language of the statute, we need not resort to legislative history and thus need not resolve this dispute. However, this legislative history supports not expanding the Director's role beyond that specifically set forth in SMARA.
[4] We do not read the Director's pleading as asserting standing as a citizen-taxpayer. For the reasons that follow, we would not find standing on that basis.
[5] Under CEQA, a "lead agency" is the public agency with principal responsibility for carrying out or approving the project. (Cal. Code Regs., tit. 14, § 15367.) A "responsible agency" is an agency other than the lead agency with discretionary approval power over the project. (Id., § 15381.) A "trustee agency" is a state agency having jurisdiction over the resources affected by the project which are held in trust for the people of the State of California. (Id., § 15386.)
[6] Although section 1021.5 refers to "any action," attorneys fees may be awarded in a mandamus proceeding. (See In re Head (1986) 42 Cal.3d 223, 227, 228 Cal.Rptr. 184, 721 P.2d 65.)